

Opinions of the United
States Court of Appeals
for the Third Circuit

1-20-1998

# In Re: Trans World

Precedential or Non-Precedential:

Docket 97-7037,97-7082

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

## Recommended Citation

"In Re: Trans World" (1998). *1998 Decisions.* Paper 14.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/14

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 20, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-7037 and 97-7082

IN RE: TRANS WORLD AIRLINES, INCORPORATED,

      Debtor

TRAVELLERS INTERNATIONAL AG,

      Appellant/Cross-Appellee
      in Appeal No. 97-7037

v.

TRANS WORLD AIRLINES, INCORPORATED; OFFICIAL
COMMITTEE OF UNSECURED CREDITORS FOR
TRANS WORLD AIRLINES

Trans World Airlines, Incorporated

      Appellant/Cross-Appellee
      in Appeal No. 97-7082

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 95-cv-00031)

Argued Friday, September 12, 1997

BEFORE: MANSMANN, NYGAARD and GARTH, Circuit Judges

(Opinion filed January 20, 1998)

Michael Joseph
Richard A. Kirby (Argued)
Joseph O. Click
Dyer, Ellis, Joseph
 & Mills
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037

Laurie S. Silverstein
Potter, Anderson & Corroon
350 Delaware Trust Building
P.O. Box 951
Wilmington, DE 19899

Attorneys for Travellers
International AG

William H. Sudell, Jr. (Argued)
Derek C. Abbott
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

Michael J. Templeton
Jones, Day, Reavis & Pogue
599 Lexington Avenue
New York, New York 10022

Attorneys for Trans World Airlines,
Incorporated

OPINION OF THE COURT

GARTH, Circuit Judge:

The sole issue we must resolve in this appeal is whether TWA was insolvent on November 4, 1991 so that the transfer of certain monies to a judgment creditor within 90 days of TWA's petition for bankruptcy constituted a preference. Our analysis of TWA's insolvency depends on how TWA's assets and liabilities should be valued.

We conclude that TWA's assets must be valued at fair market value in the context of a "going concern" and that

2

its liabilities should be measured at face value. Inasmuch as we agree with the bankruptcy court's calculations, albeit with minor qualifications, we hold that on the date in question, TWA was insolvent. Accordingly, any transfer of TWA's monies to Travellers falls within the preference statute, 11 U.S.C. S 547(b).

We will reverse the district court's order, which had reversed the insolvency holding of the bankruptcy court, and direct the district court to remand this case to the bankruptcy court for proceedings consistent with our opinion.

I.

On October 12, 1991, the United States District Court for the Southern District of New York entered a judgment in the amount of $12.3 million in favor of Travellers International AG ("Travellers") against Trans World Airlines, Inc. ("TWA"). On November 4, 1991, TWA obtained a stay of enforcement of the judgment by depositing $13.7 million in cash with the clerk of the court. Eighty-eight days after the deposit was made, on January 31, 1992, TWA filed a petition for reorganization in the United States Bankruptcy Court for the District of Delaware under Chapter 11 (11 U.S.C. S 101 et seq.). Subsequently, TWA filed a complaint against Travellers in the United States Bankruptcy Court for the District of Delaware, seeking a declaration that the $13.7 million deposit was a preferential transfer which was voidable under 11 U.S.C. S 547(b).1  See Travellers Int'l AG v. Robinson, 982 F.2d 96, 97 (3d Cir. 1992).

_____

1. 11 U.S.C. S 547(b) (1993) states:

     Except as provided in subsection (c) of this section, the trustee may
     avoid any transfer of an interest of the debtor in property--

       (1) to or for the benefit of a creditor;

       (2) for or on account of an antecedent debt owed by the debtor
       before such transfer was made;

       (3) made while the debtor was insolvent;

       (4) made--

3

A. The Bankruptcy Court Proceedings

The bankruptcy court held a four day bench trial in February 1994 to determine whether the deposit was indeed a preferential transfer. See In Re Trans World Airlines, Inc., 180 B.R. 389 (Bankr. D. Del. 1994). In particular, the court focused its attention on the statutory requirement that TWA was insolvent on the day of the transfer. See 11 U.S.C. S 547(b)(3). Following the code's guidance that a corporation is insolvent when "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation," 11 U.S.C. S 101(32)(A),2 the bankruptcy court heard evidence by experts hired by both TWA and Travellers on the value of TWA's assets and liabilities.

_____

   (A) on or within 90 days before the date of the filing of the petition;
or
   (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

   (5) that enables such creditor to receive more th an such creditor would receive if--

   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

2. 11 U.S.C. S 101(32)(A) (1993) states in full:

   "insolvent" means--

   (A) with reference to an entity other than a part nership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of--

   (i) property transferred, concealed, or removed w ith intent to hinder, delay, or defraud such entity's creditors; and

   (ii) property that may be exempted from property of the estate under section 522 of this title[.]

1. Travellers' Arguments

Travellers, together with its expert Global Aviation Associates, Ltd. ("Global"), offered testimony that TWA's assets exceeded its liabilities by almost two billion dollars, and thus that the company was solvent. Global based its "fair valuation" of TWA's assets on their market value assuming that TWA was not compelled to sell the assets under any time constraint. Applying this methodology, Global valued TWA's operating assets at $4,162,273,000. See 180 B.R. at 421. Combining this with the cash, cash equivalents, accounts receivable, and other investments owned by the company, Travellers argued that the value of the company's assets totaled $5,298,373,000.

Turning to TWA's liabilities, Travellers contended that S 101(32)(A) called for a "fair valuation" of TWA's liabilities, which Travellers insisted translated into a fair market valuation of TWA's publicly traded debt. As a result, Travellers' expert testified that TWA's debt obligations amounted to $662,898,000.3 With respect to TWA's additional liabilities, Travellers' expert testified that the value of TWA's aircraft lease obligations was $813,604,000; pension plan liabilities, $219 million; taxes, $949.7 million; and other liabilities, $947.4 million. Travellers calculated the sum of TWA's liabilities to be $3,593,000,000.

Inasmuch as TWA's assets, if valued at $5,298,373,000 exceeded its liabilities at $3,593,000,000, Travellers urged the bankruptcy court to find that TWA was solvent.

2. TWA's Arguments

TWA and its experts, Avmark Inc. ("Avmark"), offered very different valuations of both assets and liabilities. According to TWA's calculations, TWA was insolvent on November 4, 1991, the date of the transfer to the escrow account, because TWA's liabilities exceeded assets by as much as three billion dollars. Avmark based its "fair valuation" of TWA's assets on the amount realizable from the assets

_____

3. This figure is far less than the "face" value of TWA's public debts, $1,776,752,000, which we assume represented the net present value of TWA's debts as of the date of the transfer.

5

following a hypothetical sale of the assets within a reasonable time period. Referring to 12-18 months as a reasonable time period, Avmark concluded that the overall value of TWA's assets was $2,561,366,000. See 180 B.R. at 404.

As to the company's liabilities, TWA contended that the fair valuation prescription in 11 U.S.C. S 101(32)(A) did not apply to liabilities. TWA thus asked the court to consider the face value of the company's debt, rather than the much lower market value urged by Travellers, in determining the company's insolvency. TWA's calculation of the company's liabilities also included an extra $634,814,000 of what it termed contingent liabilities, as well as up to $576,000,000 of pension plan liabilities. These additional liabilities represented costs to which TWA would be subject if it had ceased operating soon after November 4, 1991: they included $138.8 million payable to two of TWA's unions, $214.8 million for severance payments pursuant to contractual obligations, and $248.2 million in wind down expenses. TWA urged the court to consider these liabilities in light of the high likelihood as of November 4, 1991 that TWA would soon cease operations. Combined with $370 million in tax liability, medical/dental benefits totaling $400 million, and almost one billion dollars of other liabilities, the liability figure urged by TWA totaled between five and five and a half billion dollars.

Because this figure exceeded the asset valuation of $2,561,366,000, TWA urged that the company was insolvent.

3. The Bankruptcy Court's Rulings

In an extensive opinion, the bankruptcy court agreed with TWA's conclusion that the company was insolvent. Addressing the valuation of assets, the court agreed with TWA that a "fair valuation" of assets would be found by calculating the amount that would be realized by converting non-cash assets into cash over a reasonable time frame. See 180 B.R. at 411. The court found Travellers' position that asset valuations exist independently of an actually realizable amount to be unrealistic. As such, the court

6

largely adopted Avmark's asset valuations. Altogether, the bankruptcy court disagreed with TWA's asset valuations in only three relatively minor categories: the company's investment in affiliates, the value of the company's gates outside of St. Louis and JFK, and the measure of the company's accounts and other receivables. In these three areas, the court found that for various factual reasons, TWA's figures were too low, and substituted Travellers' figures. The court concluded that the proper valuation of TWA's assets was $3,125,811,000.

Turning to the company's liabilities, the bankruptcy court first considered whether TWA's public debt should be measured at market value or at face value. The court concluded that face value was the proper guide for two reasons. First, the text of 11 U.S.C. S 101(32)(A) suggested that the "fair valuation" requirement did not apply to debts. Second, the court opined that valuing debts at market value would, among other things, create an unprincipled distinction between the treatment of private and public debt. See 180 B.R. at 423-24. The court thus adopted the face value figure of the company's debts urged by TWA, $1,776,752,000.

As to the liabilities incurred by the company's aircraft leases, the court accepted TWA's figure of $595 million because it appeared to be the only probative evidence put forward by the two parties. TWA's view that the medical and dental benefits obligations amounted to $400 million was also accepted. Travellers had argued that this liability should be zero because TWA's benefits program had created an offsetting good will asset among its employees. This argument was rejected on the ground that the good will was not a saleable asset and had no market value. Having largely accepted TWA's asset figures, the bankruptcy court in turn adopted TWA's estimate of its tax liability, $370 million, and also adopted Travellers' largely uncontested figure for `other' liabilities, $947,381,000.

The final liabilities to be determined were TWA's pension plan obligations and what TWA termed `contingent' liabilities. The court adopted TWA's view that these liabilities were to be assessed in light of the likelihood that TWA was on the verge of going out of business on

November 4, 1991. As a result, the court calculated the liabilities that TWA would incur if the company ceased its operations. This added $634,814,000 of contingent liabilities arising from the hypothetical liquidation to the overall liability figure, and also raised the pension plan liability from $219.4 million to $401 million. Altogether, the bankruptcy court decided that TWA's liabilities totaled $5,124,947,000, which exceeded the asset figure of $3,125,811,000 by two billion dollars. Thus, the bankruptcy court held that TWA was insolvent, and that the transfer of $13.7 million was voidable as a preference.

B. The District Court Proceedings

On appeal, the United States District Court for the District of Delaware affirmed in part, reversed in part, and remanded to the bankruptcy court. See Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 203 B.R. 890 (D. Del. 1996). The district court agreed with the bankruptcy court's position that the proper legal test for a fair valuation of the company's assets should be based on the amount that could be obtained if the assets were sold in a reasonable time. See id. at 895. Concluding that the bankruptcy court's adoption of a 12 to 18 month period as a reasonable time frame was a factual matter, and that none of the bankruptcy court's factual determinations relating to assets was clearly erroneous, the court affirmed the bankruptcy court's determination that the company's liabilities were $3,125,811,000.

On the liability side, however, the district court disagreed with the bankruptcy court's legal conclusion that the "fair valuation" requirement of 11 U.S.C. S 101(32)(A) did not apply to the company's debts. Relying largely on Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 648 (3d Cir. 1991), the district court held that both assets and liabilities were subject to the fair valuation requirement. Accordingly, the court concluded that the bankruptcy court's decision to value the public debt at face value was error. See 203 B.R. at 897–98. In all other respects, the court agreed with the bankruptcy court's legal analysis, and found that the bankruptcy court's factual conclusions were not clearly erroneous. Thus, the district

8

court reversed the portion of the bankruptcy court's decision relating to liabilities, and remanded with instructions to conduct a fair valuation of TWA's liabilities.

The instant appeal and cross-appeal followed.

II.

We exercise jurisdiction to review this appeal pursuant to 28 U.S.C. SS 1291 and 158(d). See Porter v. Mid-Penn Consumer Discount Co. (In re Porter), 961 F.2d 1066, 1072 (3d Cir. 1992). Whether a company is insolvent under the Bankruptcy Code is considered a mixed question of law and fact. See Moody v. Security Pacific Business Credit, 971 F.2d 1056, 1063 (3d Cir. 1992). While factual findings are reviewed only for clear error, our review of "the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts" is plenary. Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 103 (3d Cir. 1981).

III.

A. Asset Valuations

The first question we must answer is how to measure properly a "fair valuation" of TWA's assets according to 11 U.S.C. S 101(32)(A). Because liquidation in bankruptcy was not clearly imminent on the date of the challenged transfer, we concern ourselves with how to achieve a fair valuation of TWA's assets on a "going concern" basis. See Moody, 971 F.2d at 1067.

In the century that has passed since the enactment of the Bankruptcy Act of 1898, the courts have offered various statements describing how to achieve a fair valuation of assets for a going concern. The cases generally direct us to look at "market value" rather than "distress value," but then also caution that the valuation must be analyzed "in a realistic framework" considering amounts that can be realized "in a reasonable time" assuming a "willing seller" and a "willing buyer." See, e.g., BFP v. Resolution Trust Corp., 511 U.S. 531, 537, 114 S. Ct. 1757, 1761 (1994);

Syracuse Engineering Co. v. Haight, 110 F.2d 468, 471-72 (2d Cir. 1940). Although these statements are helpful in many cases, they fail to resolve squarely the question of law that is before us. That question centers around a disagreement about the appropriate time frame under which a hypothetical sale of assets must take place to achieve a valuation that is "fair" for a going concern.

Logic and common sense inform us that the amount that can be realized from the sale of an asset varies as a function of the time period over which the asset must be sold. If a company must sell its assets in a short time period, it may be forced to accept a relatively low price; if it can sell the assets over a longer period, it will be able to hold out for the possibility of a higher price. TWA's position, accepted by both the bankruptcy court and the district court, is that a "fair valuation" is best achieved by a hypothetical sale over 12-18 months (TWA's definition of a "reasonable" time period). That is, the value of the assets is to be measured by the sales price that could be attained if there were a period of 12-18 months to sell off the assets. Travellers, however, argues that the proper time period is substantially longer: so long, in fact, that the assets should be valued without regard to the pressures of time. In other words, Travellers maintains that the value of the assets is to be measured by the price that could be attained if TWA could hold out for as long a period as necessary to receive a `full' price on its assets.

The parties enlist a substantial body of case law in support of their respective positions. TWA bases its position on a voluminous line of cases stating that fair valuation involves a value that can be made available for payments of debts within a reasonable period of time. See, e.g., Syracuse Engineering Co., 110 F.2d at 471; Briden v. Foley, 776 F.2d 379, 382 (1st Cir. 1985); American Nat'l Bank & Trust Co. v. Bone, 333 F.2d 984, 987 (8th Cir. 1964). TWA argues that 12-18 months is a reasonable period of time, such that the use of a 12-18 month sale scenario by the bankruptcy court was proper.

Travellers, on the other hand, relies on cases stating that fair valuation of a going concern implicates a fair market valuation. See Lawson v. Ford Motor Co. (In re Roblin

10

Indus.), 78 F.3d 30, 36 (2d Cir. 1996); Briden, 776 F.2d at 382. Travellers then argues that a fair market valuation is achieved by a sale without regard to the pressures of time. See BFP, 511 U.S. at 537-38, 114 S. Ct. at 1761-62; Duncan v. Landis, 106 F. 839, 858-59 (3d Cir. 1901). Accordingly, Travellers construes the 12-18 month sale scenario used by the bankruptcy court and district court as a forced sale, which undervalued TWA's assets and led to an improper conclusion that TWA was insolvent on the date of the transfer.

We begin our analysis by recognizing the overwhelming body of authority that makes clear that a fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time. See, e.g., In re Roblin Indus., 78 F.3d at 35-36; Moody, 971 F.2d at 1068; Briden, 776 F.2d at 382; American Nat'l Bank & Trust Co., 333 F.2d at 987; Syracuse Engineering Co., 110 F.2d at 471; 2 Collier on Bankruptcy P 101.32[4] at 101-116 (15th ed. Rev. 1997).4 The question then becomes how to construe whether a given time period is reasonable. As previously indicated, TWA maintains that a reasonable time is the period of time that a company such as TWA might reasonably require to sell off its assets in order to pay off its debts and attempt to satisfy its creditors. Travellers disagrees with TWA's

_____

4. This interpretation of the fair valuation requirement followed naturally
from the text of the insolvency definition in effect from 1898 until 1978.
During that period, the Act stated that a "person shall be deemed
insolvent . . . whenever the aggregate of his property . . . shall not at fair
valuation be sufficient in amount to pay his debts." 11 U.S.C. S 1(19)
(repealed 1978). This text suggests a conversion-to-cash valuation.

In contrast, the current version states only that insolvency is a
"financial condition such that the sum of such entity's debts is greater
than all of such entity's property, at a fair valuation." 11 U.S.C.
S 101(32)(A) (1993). Although the conversion-to-cash methodology is less
obvious from the current text, courts have uniformly treated the current
version of the statute as being identical in relevant part to the earlier
version, and we will do the same. See S. Rep. No. 95-989, 85th Cong.,
2d Sess. (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5811 ("The
definition of `insolvent' in paragraph [(32)] is adopted from section 1(19)
of current law. . . . It is the traditional bankruptcy balance sheet test of
insolvency.").

approach, and asserts that a reasonable period is the time that an active company might reasonably take to sell its assets in the typical course of business at the highest available price.

We believe that the proper point of reference for determining a "reasonable" time period in the case of S 101(32)(A) should begin with the financial interests of the creditors. See Syracuse Engineering Co., 110 F.2d at 471. The reasonable time should be an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price. Cf. id. This test satisfies the requirement of a fair valuation because it identifies, as best it can, the equilibrium point between the two competing concerns of creditors: the desire to maximize the dollar figure from the assets to be sold, and the desire to have the assets sold off quickly to satisfy creditors' claims sooner rather than later. The competing view that fair valuation contemplates a hypothetical sale without regard to the pressures of time fails in light of contrary authority. See Briden, 776 F.2d at 382 ("Asset valuation. . . should be reduced by the value of the assets not readily susceptible to liquidation and the payment of debts"); Stern v. Paper, 183 F. 228, 230-31 (D.N.D. 1910) ("[F]air valuation . . . means a value that can be made promptly effective by the owner of property to pay his debts.") (quotations omitted).

Contrary to the assertions of Travellers, Duncan v. Landis, 106 F. 839 (3d Cir. 1901), does not support Travellers' position that the hypothetical sale must take place absent time pressures. In Landis, this court evaluated a set of jury instructions concerning how to achieve a fair valuation of a debtor's assets. The district court had instructed the jury using the traditional equity test for insolvency, that a debtor was solvent only if the debtor was able to meet all obligations when they became due. This court reversed, holding that a fair valuation of assets was not achieved when a debtor was forced to sell assets "at once" on the date the debt matured. Id. at 859.

12

We disagree with Travellers' view that Landis holds that a fair valuation implicates a hypothetical sale absent time pressures. As we read Landis, it presages the view we have espoused: that fair valuation does not preclude a continuing business from valuing its assets in contemplation of a reasonable time for their liquidation. Thus, whereas the district court in Landis required insolvency to be measured by the value of those assets available at the time the debt became due, the court of appeals found that formula to be in error. As our court instructed then, the application of such a formula to measure the value of the debtor's assets would permit creditors "to take advantage of the necessities and embarrassments of the [debtor] in order to procure" the assets at a price less than their fair value. Id. at 858.

We are satisfied that the bankruptcy court applied the appropriate legal standard in determining the fair valuation of TWA's assets. See In re Trans World Airlines, 180 B.R. at 412, 412 n.30. In light of the size and nature of Trans World Airlines, the bankruptcy court's determination that 12 to 18 months was a "reasonable time" to value TWA's assets is not clearly erroneous. Such a span of time reflects the period in which a diligent administrator, concerned with the interests of TWA's creditors, could inventory, prepare, and sell TWA's considerable assets in a reasonable fashion. Further, we agree with the district court that none of the remaining factual findings by the bankruptcy court relating to assets were clearly erroneous. Consistent with the district court's holding that affirmed the bankruptcy court's asset valuation, we hold that TWA's assets as of November 4, 1991 were worth $3,125,811,000.

B. Liability Valuations

Next we must decide how to value TWA's liabilities under 11 U.S.C. S 101(32)(A). To decide this issue we must address the extent to which the valuation of liabilities under the Bankruptcy Code should be based upon actual market conditions faced by the debtor. In particular, we must resolve two legal questions: first, whether TWA's publicly traded debt should be measured at face value or market value, and second, whether liquidation costs should

13

be included as contingent liabilities. Then, we must review one factual question: whether the bankruptcy court was correct in finding that TWA's debt was not reduced by one billion dollars under an agreement between TWA and its creditors.

1.

The first question is whether TWA's publicly traded debt should be measured at its face value of $1,776,752,000, or its market value of $662,898,000. Both TWA and Travellers assume, as did the bankruptcy court and district court, that the question of whether to use face value or market value hinges upon a question of statutory interpretation. 11 U.S.C. S 101(32)(A) states that insolvency is the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." The parties indicate that if we agree with the district court that "fair valuation" in S 101(32)(A) modifies both "property" and "debts," then we should adopt the market value figure for TWA's debt. If, on the other hand, we agree with the bankruptcy court that "fair valuation" as found in the statute modifies only "property," then our insolvency calculations should utilize the face value of TWA's publicly traded obligations.

Travellers argues that S 101(32)(A) demands a market valuation because the phrase "fair valuation" in S 101(32)(A) modifies both "property" and "debts," such that the fair market valuation used for assets should apply equally to liabilities. For support, Travellers points to statements made by this court and others suggesting that the fair valuation requirement of S 101(32)(A) applies to TWA's debts. See, e.g., Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 648 (3d Cir. 1991) ("The debtor's assets and liabilities are tallied at fair valuation to determine whether the corporation's debts exceed its assets."); Briden, 776 F.2d at 382 (noting that the insolvency definition "focuses on the fair market value of the debtor's assets and liabilities").

However, TWA maintains that the appropriate valuation of TWA's public debt is its face value rather than its market

14

value because the requirement of a "fair valuation" in S 101(32)(A) does not apply to debts and should not be construed to do so. For support, TWA points to the text of the insolvency definition that was in effect until 1978.[5] According to TWA, the pre-1978 statute makes clear that the fair valuation requirement applies to properties but not to debts. Second, TWA points to the insolvency definition that applies to partnerships, codified at 11 U.S.C. S 101(32)(B).[6] Because this definition applies the fair valuation standard only to property (assets), and there is no reason to think that partnerships and corporations should be treated differently in this respect, TWA argues that its debt is not subject to a fair valuation requirement. Accordingly, TWA argues that its debt should be considered at its face value.

We agree with TWA that we must consider the face value of TWA's publicly traded debt rather than the market value. This follows from our determination that we must treat TWA as a "going concern." See Moody, 971 F.2d at 1067. Because we treat TWA as a going concern, we cannot consider the market's devaluation of TWA's debt resulting from the possibility as of the date of the transfer that TWA would cease operations and be unable to satisfy its promises. It is this devaluation that creates the difference between the face value figure urged by TWA and the market value figure Travellers would have us adopt: the former represents the net present value of TWA's obligations, while the latter represents the net present value of TWA's

_____

5. See note 4, supra.

6. 11 U.S.C. S 101(32)(B) (1993) states that "insolvent" means:

    (B) with reference to a partnership, financial condition such that
    the sum of such partnership's debts is greater than the aggregate
of,
    at a fair valuation--

    (i) all of such partnership's property, exclusive of property of
the
    kind specified in subparagraph (A)(i) of this paragraph; and

    (ii) the sum of the excess of the value of each general partner's
    nonpartnership property, exclusive of property of the kind
specified
    in subparagraph (A) of this paragraph, over such partner's
    nonpartnership debts[.]

15

obligations but discounted by the likelihood that TWA will be unable to pay its debts in full.

Thus, even accepting the dictum in Metro Communications stating that we must fairly value liabilities, see 945 F.2d at 648, in this context we do not interpret the term "fair valuation" to mean fair market valuation. Because our going concern methodology precludes us from devaluing TWA's debt based on creditors' perceptions of TWA's viability, a fair valuation of TWA's public debt is the face value of that debt. See Covey v. Commercial Nat'l Bank, 960 F.2d 657, 660 (7th Cir. 1992) (holding that valuation of debt must be made from the perspective of the debtor, rather than the perspective of a third party creditor).7 Accordingly, we hold that the proper figure for TWA's publicly traded debt is the debt's face value of $1,776,752,000.

2.

We proceed to consider whether the bankruptcy court erred in including amongst TWA's liabilities various costs that TWA would incur if TWA were to cease operations within 12-18 months of the date of the transfer. The bankruptcy court deemed it proper to consider the costs that TWA would suffer if it were to cease operations because courts must consider "contingent liabilities" in their calculations of liability in an amount discounted by

_____

7. As the bankruptcy court noted, anomalous results would occur if we allowed liabilities to be valued based on the debtor's financial position:

> If holders of claims are fully informed of the debtor's affairs and the
> asset values are less than the face amount of the claims, they would
> never value their claims at more than the value of the assets.
> Likewise, the fully informed debtor would never be willing to pay
> claimants more than claimants would be willing to take. Thus, the
> value of the claims would never exceed the value of the assets and
> insolvency could never occur.

180 B.R. at 424. See also Covey, 960 F.2d at 660 ("The beneficiary of a guarantee never values that obligation at more than the issuer's gross assets, and if other claims (say, secured debts) stand ahead of this one, the beneficiary does not value the guarantee at more than the issuer's net assets.").

16

the probability that the contingency will occur. See In re Trans World Airlines, 180 B.R. at 426-27. The bankruptcy court reasoned that under the 12-18 month sale scenario it used to value TWA's assets, the liabilities contingent upon TWA's projected dissolution would become fixed. The bankruptcy court was also influenced by the probability as of the date of the transfer that TWA would soon be forced to cease operations. Accordingly, the bankruptcy court held that it was proper to include the full costs of TWA's dissolution as liabilities, even though TWA was not liquidating on November 4, 1991. These liabilities totaled $816.4 million, and consisted of $248.2 million in wind down expenses, $214.8 million for severance payments, $181.6 million in additional pension plan liabilities, $138.8 million payable to TWA's unions, and $33.1 million of COBRA obligations.8

We agree with the bankruptcy court that it is proper to consider contingent liabilities when evaluating the insolvency of a corporation pursuant to 11 U.S.C. S 101(32)(A). See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.), 92 F.3d 139, 156 (3d Cir. 1996); In re Xonics Photochemical, Inc., 841 F.2d 198, 200 (7th Cir. 1988); Syracuse Engineering Co. v. Haight, 97 F.2d 573, 576 (2d Cir. 1938) (L. Hand, J.). However, we cannot agree that costs associated with the dissolution of the debtor can be included under that rubric. Indeed, it is the antithesis of a "going concern" valuation to include such costs. See 2 Collier on Bankruptcy P 101.32[4] at 101-116 (15th ed. Rev. 1997) ("There is overwhelming authority to the effect that . . . subsequent dismemberment . . . should not enter into the picture.") (citing cases). Rather, contingent liabilities must be limited to costs arising from foreseeable events that might occur while the debtor remains a going concern. See FDIC v. Bell, 106 F.3d 258, 264 (8th Cir. 1997). Because we treat TWA as a going concern, we will not include in the insolvency calculation

_____

8. COBRA obligations require employers to provide certain employees with continued health care coverage following job loss. See Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. SS 1161-1168 (West Supp. 1997).

17

the $816.4 million in liabilities associated with TWA's dissolution that was included by the bankruptcy court.

3.

The final issue we address is whether the bankruptcy court's factual finding that TWA had not reached an agreement with its creditors to reduce its public debt by $1 billion was clearly erroneous. Travellers maintains that prior to November 4, 1991, TWA had entered into a pre-petition agreement with its public debt holders in which the creditors had agreed to reduce TWA's debt burden by $1 billion in exchange for certain concessions from TWA. Travellers points primarily to press releases and SEC filings authored by TWA, which indicate that TWA was attempting to restructure its debts in anticipation of reorganization under Chapter 11.

The bankruptcy court found that these efforts had not yet come to fruition as of the date of the transfer, such that the value of TWA's public debt could not be reduced by the $1 billion proposed in the debt restructuring plan. According to Travellers, the bankruptcy court clearly erred in concluding that TWA and its creditors had not reached a binding agreement, which would have reduced the face value of TWA's debt (and thus TWA's liability) by $1 billion.

On review of the record, we hold that the bankruptcy court's finding was not clearly erroneous. Although the record is clear that TWA and its creditors had entered into negotiations, there is little support for the view that the agreement had been finalized as of November 4, 1991. All of the documents relied upon by Travellers that are dated prior to November 4, 1991 are either marked as drafts, or else indicate that the terms of the proposed agreement had not been finalized. Further, only certain elements of the alleged agreement were finalized in the plan that was ultimately approved on August 11, 1993. Accordingly, we cannot conclude that the bankruptcy court's finding that no agreement existed as of the date of the transfer was clearly erroneous. See Haines v. Liggett Group, Inc., 975 F.2d 81, 92 (3d Cir. 1992) ("[T]he appellate court must accept the factual determination of the fact finder unless

18

that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.") (quotations omitted).

IV.

The holding of the bankruptcy court in this case was that TWA was insolvent on November 4, 1991 because the value of TWA's liabilities exceeded that of its assets. According to the bankruptcy court, TWA's liabilities totaled $5,124,947,000, which exceeded its asset valuation of $3,125,811,000 by two billion dollars. On review of the legal and factual issues in this case, we have concluded that the bankruptcy court's calculations were correct except insofar as the bankruptcy court included $816.4 million in liabilities associated with TWA's dissolution. Subtracting this sum from the bankruptcy court's liability figure, we conclude that the proper valuation of TWA's liabilities on the date of the transfer was $4,308,547,000. Because this figure still exceeds the $3,125,811,000 valuation of TWA's assets, we conclude that the bankruptcy court was correct in holding that TWA was insolvent as of November 4, 1991, and that the deposit of $13.7 million on that date to stay the enforcement of the judgment against TWA in favor of Travellers was a voidable preferential transfer pursuant to 11 U.S.C. S 547(b).

Accordingly, we will reverse the district court's order dated December 30, 1996, which had reversed the insolvency holding of the bankruptcy court, and we will direct the district court to remand this case to the bankruptcy court for further proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

19