**In re LIDS CORPORATION, Debtor.**

**Lids Corporation, Plaintiff,**

v.

**Marathon Investment Partners, L.P., Defendant.**

**Bankruptcy No. 01–21 (MFW).**
**Adversary No. 01–4758(MFW).**

United States Bankruptcy Court, D. Delaware.

Aug. 6, 2002.

---

Michael R. Lastowski, Ralph N. Sianni, Duane Morris, LLP, Wilmington, DE, Paul D. Moore, Duane Morris, LLP, Boston, MA, for Debtor.

Robert Dehney, Jason Staib, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, DE, Jay R. Indyke, Kronish, Lieb, Weiner & Hellman, New York City, for Official Committee of Unsecured Creditors.

Henry A. Heiman, Heiman, Aber, Goldlust & Baker, Wilmington, DE, Anthony M. Feeherry, Goodwin Proctor, LLP, Boston, MA, for Marathon Investment Partners, LLP.

## OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

This matter is before the Court on the Complaint of Lids Corporation ("Lids") to avoid a security interest granted to Marathon Investment Partners, L.P. ("Marathon") pursuant to sections 547 and 550 of the Bankruptcy Code. At trial, Marathon asserted that the security interest is not avoidable as a preference because Lids was not insolvent at the time. For the reasons set forth below, we find that Lids was insolvent at all relevant times, and, therefore, we conclude that the security interest is avoidable.

## I. FACTUAL BACKGROUND

Lids, founded in 1992, was a retail company that specialized in selling licensed logo sports caps and other brand name hats. From 1992 to 2000, Lids grew from a single kiosk to 388 stores in 47 states, and launched a website in October 2000 (Lids.com) which offered hats via the Internet. On September 26, 2000, Lids and Footstar, Inc.[2] announced a strategic alliance to offer Lids' products at Footstar locations. Under that agreement, Lids operated freestanding shops within Just For Feet superstores, and the companies shared Lids' sales revenues from these locations.

From 1998 through 2000, Lids spent roughly $53 million to fund losses of $22 million and to provide $31 million for expansion. Lids' business model was rapid expansion in pursuit of revenue growth. However, this rapid expansion was very costly and Lids was unable to produce positive cash flows. For fiscal year end ("FYE") 1998, Lids' earnings before interest, taxes, depreciation, and amortization ("EBITDA") was negative $1 million; for FYE 1999, EBITDA was negative $2.8 million; for the twelve months ending January 4, 2001, EBITDA was negative $6.7 million.

On September 13, 1996, Lids executed a credit agreement ("the Credit Agreement") with Fleet Retail Finance, Inc.

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

2. Footstar, Inc., had filed bankruptcy on November 4, 1999.

("Fleet"). On April 22, 1999, in need of additional financing, Lids and Marathon executed a Warrant Purchase Agreement and a 12% Note due in 2004 for $2.5 million ("the Note"). By 2000, Lids was in violation of numerous covenants in its agreements with Fleet and Marathon. In May 2000, Lids requested a waiver of the covenant defaults from Marathon. On September 15, 2000, the First Amendment to the Note and Warrant Purchase Agreement and a Security Agreement were executed by Lids and Marathon. Under those agreements, the interest rate on the Note was increased to 14%, and Lids granted Marathon a security interest in all of its personal property. In exchange, Marathon waived Lids' covenant defaults. Marathon perfected its security interest in Lids' property on October 20, 2000.

During 2000, Lids needed an additional $30 million to continue operations and finance losses. However, Lids was only able to raise only $14.9 million. That same year, Lids began looking for potential buyers but was unsuccessful.

In October 2000, Lids hired James Marcum ("Marcum") as Chief Operating Officer to effectuate an organizational restructuring and bring Lids out of its financial downward spiral. After some extensive internal investigation, Marcum became seriously concerned about the financial condition of the company. In November 2000, Marcum prepared a presentation for Lids' Board of Directors. Based on the figures in the presentation, Marcum believed that there would be no availability under the Credit Agreement with Fleet by January 2001 and that, consequently, Lids would require a new credit facility.

On December 6, 2000, Fleet informed Lids that it would begin restricting the amount of credit available to Lids because of Lids' covenant defaults. Fleet began to decrease the amount of credit available to Lids on December 14, 2000.

Lids was unable to secure an alternate lender or locate a buyer and on January 4, 2001, Lids filed a voluntary petition under Chapter 11 of the Bankruptcy Code. After the filing, Lids maintained business as usual while it continued to search for a buyer. Only two buyers made offers for Lids: Hat World, Inc. ("Hat World") and Lids Acquisition, Inc. Ultimately, Hat World made the higher offer (approximately $16 million) and an order authorizing the sale of substantially all of Lids' assets to Hat World pursuant to section 363 of the Bankruptcy Code was entered on April 12, 2001. The sale closed on April 13, 2001.

On July 5, 2001, Lids filed a Complaint to avoid the security interest granted to Marathon. Marathon filed an Answer on August 9, 2001. On December 7, 2001, Lids and Marathon filed a Joint Pretrial Statement, and trial was held on December 10 and 11, 2001. Lids and Marathon filed Post–Trial Memoranda on January 22, 2002, and Reply Memoranda on January 31, 2002.

## II. *JURISDICTION*

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(1), (b)(2)(A), (F), (K), and (O).

## III. *DISCUSSION*

This case is before the Court on Lids' Complaint to avoid the security interest granted to Marathon, pursuant to section 547(b) of the Bankruptcy Code, which provides that:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

.   .   .   .   .

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

11 U.S.C. § 547(b).

The parties have stipulated to all of the elements necessary to avoid the transfer of the security interest under section 547(b), except section 547(b)(3). Thus, the only issue is whether Lids was "insolvent" on October 20, 2000 ("the Valuation Date"), the date when Marathon perfected its security interest by filing financing statements with the appropriate government offices.

### A. "Insolvent" under the Bankruptcy Code

Section 101(32)(A) of the Bankruptcy Code defines "insolvent" as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A). This standard for solvency is typically called the "Balance Sheet Test." *In re Trans World Airlines, Inc.*, 180 B.R. 389, 405 n. 22 (Bankr.D.Del. 1994). However, this may be a misnomer because the Balance Sheet Test is based on a fair valuation and not based on Generally Accepted Accounting Principles

("GAAP"), which are used to prepare a typical balance sheet. *Id.*

Several different valuation methodologies are recognized as effective ways of determining the solvency of a company for purposes of section 547. *See id.* at 411 n. 28. However, we will only address the methodologies applied by the parties in this case. Both parties retained experts to value Lids as of the Valuation Date. Marathon retained Houlihan Lokey Howard & Zukin ("Houlihan"), and Lids retained Ernst & Young Corporate Finance, LLC ("EYCF"). Houlihan and EYCF used several different methodologies to value Lids.

### B. Presumption of Insolvency and Burden of Proof

Section 547(f) provides that "for the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). "A presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption." Fed. R.Evid. 301.[3] Therefore, Marathon must present sufficient evidence that Lids was solvent on the Valuation Date to rebut the presumption created by section 547(f). If Marathon fails to present evidence to rebut the presumption, Lids is entitled to rely on the presumption to establish that it was insolvent. *See* 11 U.S.C. § 547(g). *See also In re Old World Cone Company*, 119 B.R. 473, 477 (Bankr.E.D.Pa.1990). However, if Marathon presents evidence that rebuts the presumption, then the burden of persuasion shifts to Lids to convince the Court that it was insolvent on the relevant date. *See* 11 U.S.C. § 547(g). *See also Trans World Airlines*, 180 B.R. at

---

**3.** Federal Rule of Bankruptcy Procedure 9017 makes the Federal Rules of Evidence applica-   ble in bankruptcy cases.

404; *Old World Cone Company,* 119 B.R. at 477.

#### C. *Marathon's Solvency Analysis*

Marathon relies largely on Houlihan's financial analyses and conclusions and on other non-financial evidence to rebut the presumption that Lids was insolvent on the Valuation Date.

#### 1. *Balance Sheet Test*

■ Lids and Marathon agree that the Balance Sheet Test is used to determine solvency for the purposes of section 547. *See Trans World Airlines,* 180 B.R. at 405 (solvency determined based on Balance Sheet Test). The parties also agree that Lids should be considered as a "going concern." A "going concern" is a commercial enterprise actively engaging in business with the expectation of indefinite continuance. BLACK'S LAW DICTIONARY 592 (7th ed.1999). As long as liquidation in bankruptcy is not clearly imminent on the Valuation Date, the company must be valued as a going concern. *See e.g., In re Trans World Airlines, Inc.,* 134 F.3d 188, 193 (3d Cir.1998). As of the Valuation Date, Lids planned to continue operations as usual. Therefore, it must be valued as a going concern on that date.

##### a. *Asset Valuation*

■ As stated in section 101(32)(A), assets should be measured at a "fair valuation." 11 U.S.C. § 101(32)(A). In the context of a going concern, fair valuation of assets is:

> "market value" rather than "distress value," but ... the valuation must be analyzed "in a realistic framework" considering amounts that can be realized "in a reasonable time" assuming a "willing seller" and a "willing buyer."

*Id.* at 193–94. More specifically, "a fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time." *Id.* at 194. The Third Circuit Court defined a "reasonable time" as:

> an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price.

*Id.* at 195. Therefore, assets should be valued at the sale price a willing and prudent seller would accept from a willing and prudent buyer if the assets were offered in a fair market for a reasonable period of time.

Houlihan prepared a report ("the Houlihan Report") of its analyses and conclusions regarding the value of Lids' assets as of the Valuation Date. In its report, Houlihan primarily relied on three valuation methodologies—adjusted balance sheet, market multiple, and comparable transaction—to establish the value of Lids' assets.

For the purposes of its solvency analysis, the Houlihan Report defines "fair value" as:

> the amount that may be realized if the Company's aggregate assets are sold as an entirety with reasonable promptness in an arm's length transaction under present conditions for the sale of comparable business enterprises, as such conditions can be reasonably evaluated by Houlihan Lokey.

(Exh. 66 at p. 1.)

Lids claims that the Houlihan Report fails to apply the correct definition of fair value, seemingly because Houlihan's definition did not include "fair market price." However, we find no indication that Houli-

han has applied the wrong standard of value. Fair market price is implicit in Houlihan's definition. Houlihan is not required to state explicitly that its definition of value is synonymous with fair market price if it is implicit in the definition.

### i. *Adjusted Balance Sheet*

■ Houlihan and EYCF have each presented adjusted balance sheet values for Lids' assets. However, the parties offer remarkably different values. While Houlihan asserts that Lids' total assets range from $48,950,000 to $55,950,000, EYCF claims that Lids' assets were worth $17,524,000.

Houlihan's balance sheet is arranged in three categories labeled "GAAP as of October 2000," "Low Fair Value ('LFV')," and "High Fair Value ('HFV')." (Exh. 66 at p. 12.) The GAAP category reflects Lids' value calculated under GAAP. The LFV and HFV represent the range Houlihan has assigned to Lids' adjusted value. With only one exception, the LFV and HFV figures are identical to the figures in the GAAP category. The only adjustments made to the LFV and HFV figures on the balance sheet were to Lids' "Goodwill." The LFV estimate of Lids' goodwill is negative $65,000, while the HFV estimate is positive $6,935,000. However, the Houlihan Report does not contain any explanation of the adjustments made on the balance sheet.

Lids asserts that the balance sheet presented in the Houlihan Report fails to ascribe fair market value to Lids' assets. Lids claims that Houlihan simply adopted the GAAP figures as of October, 2000, without adjusting to reflect the fair market value of the assets, which was much less. Lids also asserts that attributing any value to Lids' goodwill is groundless because of Lids' history of accelerating losses.

EYCF prepared its own valuation, which differs substantially from the Houlihan Report. EYCF presented an adjusted balance sheet under "Scenario One: Sale of Assets Over a Reasonable Period of Time." Unlike the Houlihan Report, EYCF's balance sheet includes numerous adjustments to the book values assigned to assets and liabilities. This analysis starts with the book values and the estimated recoverable percent of each asset's value to determine the total fair market value of Lids' assets. For example, EYCF estimated that on sale of its inventory, Lids could recover 105% of its cost. The book value of Lids' inventory was $15,633,000 based on a valuation performed by Great American Appraisals & Valuation Services, LLC. Thus, EYCF estimated the fair market value of Lids' inventory to be $16,415,000. Applying the same methodology to the other assets, EYCF estimated the total value of Lids' assets to be $17,524,000.

■ Based on the evidence presented by both parties, we find Houlihan's balance sheet analysis unconvincing as to Lids' solvency. Houlihan's balance sheet simply reflects the book value of Lids' assets reported under GAAP. The only adjustment was a minor adjustment to the goodwill account. It is well established that although GAAP is relevant in section 547 solvency analysis, it is not determinative. *See e.g., Arrow Electronics, Inc. v. Justus (In re Kaypro)*, 230 B.R. 400, 413 (9th Cir. BAP 1999) ("[T]here is no generally accepted accounting principle method for analyzing the insolvency of a company.... Although such principles are relevant, they are not controlling in insolvency determinations"); *In re Sierra Steel, Inc.*, 96 B.R. 275, 278 (9th Cir. BAP 1989) ("although GAAP are relevant, they are not controlling in insolvency determinations"); *In re Lease–A–Fleet, Inc.*, 155 B.R. 666, 679 (Bankr.E.D.Pa.1993) ("Courts are not required to rely upon GAAP standards when determining the issue of insolvency"); *In*

*re Joshua Slocum, Ltd.,* 103 B.R. 610, 623–24 (Bankr.E.D.Pa.1989) ("While GAAP principles do not control this court's determination of insolvency, we are inclined to accord weight to a company's treatment of its assets and liabilities according to GAAP"). Therefore, Houlihan's adoption of GAAP value for Lids' assets (without any adjustment to reflect market value) is not determinative of Lids' solvency.

We need not conclude that EYCF's valuation is correct. At a minimum though, the adjusted balance sheet presented by EYCF raises significant doubt about the validity of Houlihan's valuation. Therefore, we conclude that Houlihan's evidence of valuation based largely on the book value of Lids' assets does not rebut the presumption that Lids was insolvent.

ii. *Market Multiple Methodology*

Houlihan also applied a Market Multiple Methodology to value Lids' assets. Under this methodology, net revenues and earnings are multiplied by an appropriate range of risk-adjusted multiples to determine the company's total enterprise value.

In its analysis, Houlihan selected multiples by bench marking certain publicly traded companies, using quantitative and qualitative factors.

■ The Market Multiple Methodology is an acceptable technique for determining solvency. *See, e.g., Covey v. Commercial Nat. Bank of Peoria,* 960 F.2d 657, 660 (7th Cir.1992); *Trans World Airlines,* 180 B.R. at 411 n. 28.

■ Houlihan selected the following comparable companies in its market multiples analysis: Finish Line, Inc., Wet Seat, Inc., Gadzooks, Inc., Reeds Jewelers, Inc., and several others. Houlihan chose these companies as comparables because they are specialty retailers, as is Lids. Houlihan calculated multiple ranges for net revenue and EBITDA for each of the comparable companies selected. Based on the multiples for the comparable companies, Houlihan selected a range of multiples to be applied to Lids for revenue and EBITDA as follows:

| LTM [4] Ended 10/31/00 | Representative Level (000's) | Multiple Range | Value (000's) |
|---|---|---|---|
| TEV [5]/Revenue | $125,586 | 0.20x – 0.25x | $25,117 – 31,397 |
| **Projected FYE 1/27/01** | | | |
| TEV/Revenue | $130,206 | 0.15x – 0.20x | $19,531 – 26,041 |
| **Projected FYE 1/26/02** | | | |
| TEV/Revenue | $146,342 | 0.10x – 0.15x | $14,634 – 21,951 |
| EBITDA | $ 5,513 | 4.0x – 5.0x | $22,052 – 27,566 |
| Concluded TEV | | | $20,000 – 27,000 |

(Exh. 66 at p. 14.) Houlihan multiplied Lids' projected revenues and EBITDA by the appropriate ranges of multiples to determine Lids' total enterprise value range. (However, Houlihan did not use EBITDA

to estimate Lids' total enterprise value for LTM ended October 31, 2000, or Projected FYE January 27, 2001, because Lids' EBITDA was negative for those periods

4. Last twelve months ("LTM").

5. Total Enterprise Value ("TEV")

and would not yield a positive total enterprise value.)

Lids asserts that Houlihan's application of the Market Multiple Methodology is flawed. Specifically, Lids contends that the companies selected by Houlihan as comparable are not similar to Lids because (i) the companies selected were profitable, while Lids was never profitable, (ii) the companies have proven business plans, while Lids' strategy has never yielded financial success, and (iii) the companies are established and performance is predictable, while Lids has consistently missed projections. Lids asserts Houlihan failed to consider how a buyer would discount the enterprise value of Lids based on these adverse factors.

Further, Lids asserts that the EBITDA multiples used in the Houlihan Report were inaccurate because the multiples used for Lids were greater than the mean and median multiples used for the other, more profitable and stable, companies. While the mean and median EBITDA multiples for the comparable companies were 3.8 and 3.6 respectively, Houlihan applied a range of 4.0 to 5.0 to Lids' projected EBITDA for FYE January 26, 2002.

Lids claims that Houlihan's use of net revenue multiples is also inappropriate because these multiples fail to account for profitability and improperly skew values upward. For example, a store may generate sales revenue, but operate at a substantial loss; the net revenue multiple counts the store's revenues, but fails to account for its losses. Lids asserts that a more pragmatic approach would include both revenues and profits.

Lids' expert, EYCF, also applied a Market Multiples Methodology to value Lids as of October 2000 (Exh. 69.) However, unlike Houlihan, EYCF did not use total EBITDA or net revenue in its analysis.

Instead, EYCF presented scenarios based on what buyers would do. In "Scenario 3: Hypothetical Sale of Profitable Stores," EYCF assumed a buyer would only purchase Lids' profitable stores. Based on this assumption, EYCF adjusted Lids' financial results to reflect only those stores. According to those adjusted figures, Lids' EBITDA for LTM October 2000 was $2.5 million. Applying a range of multiples (3.75 to 4.75) to Lids' adjusted EBITDA, and adding to that figure the expected return after the remaining stores are liquidated, EYCF estimated Lids' total asset value ranged from $10.4 million to $12.8 million.

Based on Lids' assertions and EYCF's market multiple analysis, we find Houlihan's market multiple asset valuation unconvincing. We are not persuaded that Houlihan's choice of multiples accurately reflects the comparable companies' values for the reasons asserted by Lids. We also find that Houlihan has improperly relied on Lids' projections to calculate value. Over the last few years, Lids has consistently failed to meet its projections; in 2000 alone, Lids' budget was revised three times to account for poor performance. Despite these revisions, Lids still missed its projections for 2000.

Furthermore, the Houlihan Report assumed that after October 31, 2000, when Lids' EBITDA was negative $6,299,000, the company would nonetheless turn around. Houlihan relied on Lids' projections that at FYE January 27, 2001, its EBITDA would increase to negative $3,456,000, and that at FYE January 26, 2002, its EBITDA would be positive $5,513,000. There is no evidence to support the assumption that such a dramatic change would occur. Therefore, any conclusions based on these projections are unconvincing. As a result, we conclude that Houlihan's Market Multiple Methodol-

ogy has failed to establish that Lids was solvent on the Valuation Date.

### iii. *Comparable Transaction Methodology*

Houlihan also used the Comparable Transaction Methodology to value Lids' assets, which examines recent transactions where companies have been bought and sold on the market.

■ The Comparable Transaction Methodology is sufficient because this methodology is designed to yield the price the company would carry in the marketplace based on similar transactions. As one court has stated:

> To decide whether a firm is insolvent . . . a court should ask: *What would a buyer be willing to pay for the debtor's entire package of assets and liabilities?* If the price is positive, the firm is solvent; if negative, insolvent.

*Id.* at 660 (emphasis added).

■ Houlihan valued Lids under the Comparable Transaction Methodology for LTM October 2000 using only a net revenue range of multiples developed from information on nineteen companies involved in transactions between 1995 and 2001. Houlihan multiplied Lids' net revenue for LTM October 2000 by the range of multiples (0.25x – 0.30x) to yield an estimated total enterprise value from $31 to $38 million.

Lids asserts that using net revenue multiples does not accurately reflect value because it fails to account for losses or profitability and skews values upward. Lids also claims that Houlihan's application of the Comparable Transaction Methodology is incorrect because Houlihan failed to account for the current economic environment and market conditions. The sales transactions considered by Houlihan occurred long ago, before market conditions changed.

EYCF also acknowledged the Comparable Transaction Methodology in its report. However, EYCF stated that it found no companies comparable to Lids based on the size, nature of the business, and profitability for the purposes of a comparable transaction analysis. Therefore, EYCF stated it could not conduct this type of analysis.

We conclude that Houlihan's Comparable Transaction analysis of Lids is unconvincing. The net revenue multiple used by Houlihan does not accurately reflect Lids' value, because it ignores the fact that Lids has never been profitable while comparing it to profitable companies. We also find that the sales considered by Houlihan are outdated. Most of the transactions considered in the Houlihan Report occurred several years ago, long before market conditions changed, for the worse. Thus, the comparable sales considered by Houlihan are too old to be probative of Lids' value as of October, 2000.

### b. *Debt Valuation*

■ After determining the value of Lids, it is necessary to reduce that value by the liabilities which existed on the Valuation Date to determine if Lids was solvent. Section 101(12) defines "debt" as "liability on a claim." 11 U.S.C. § 101(12). Section 101(5)(A) defines "claim" as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A). Unlike assets, debts are measured at their face value and not at market value. *See Trans World Airlines,* 134 F.3d at 196 (publicly traded debt is measured by face value, not market value). Debts are measured at face value because the language "at a fair valuation" in section 101(32)(A) applies only to the valua-

tion of assets; it does not apply to valuation of debts. *Id.* at 196.

■ Contingent liabilities must also be included in the total debt. However, "contingent liabilities must be limited to costs arising from foreseeable events that might occur while the debtor remains a going concern." *Id.* at 198. Contingent liabilities do not include costs associated with liquidation or dissolution of the debtor because such costs inherently contradict the going concern classification of the debtor. *Id.* Therefore, when conducting a balance sheet analysis, the fair market value of the assets is compared to the face value of the liabilities, including contingent liabilities.

Houlihan listed Lids' liabilities at $13,464,000 as of the Valuation Date. The figure is broken down in Houlihan's balance sheet as follows:

| Liability Account | Value |
| --- | --- |
| Current Portion of Long–Term Debt | $ 1,484,000 |
| Short Term Borrowings | $ 9,662,000 |
| Long Term Debt | $ 632,000 |
| Subordinated Debt | $ 1,686,000 |
| Total | $13,464,000 |

(Exh. 66 at p. 12.) Houlihan, however, excluded from its calculation "Other Non–Current Liabilities" of $1,477,000.[6] Additionally, Houlihan failed to account for additional contingent liabilities which EYCF added to Lids' balance sheet ($10,285,000 to $89,317,000) consisting of lease rejection and severance obligations. The latter were based on EYCF's assumption that a buyer would take only profitable stores thereby requiring Lids to liquidate the remaining stores.

Although we do not conclude that the contingent liabilities presented by EYCF are accurate, we conclude that Houlihan improperly valued Lids' debt by excluding

the $1,477,000 in liabilities and failing to account for any contingent liabilities. Consequently, we conclude that the $13,464,000 in debt presented by Houlihan is not an accurate figure.

### c. Houlihan's Conclusions

Based on the values Houlihan assigned to Lids' assets and debts, Houlihan concluded that Lids' assets exceeded debts by $12,738,000 to $19,738,000 on the Valuation Date. Marathon therefore asserts that Lids was solvent as of the Valuation Date. EYCF reached a much different conclusion regarding the value of Lids' assets and debts. Based on its analyses, EYCF estimated that Lids' debts exceeded assets by a range of $8.5 million to $107.5 million, making Lids deeply insolvent.

We conclude that the Houlihan Report does not rebut the presumption of insolvency imposed under section 547(f) because Houlihan's valuations are flawed and because EYCF's report raises serious doubts about the validity of Houlihan's assumptions. We are not convinced that the figures Houlihan has assigned to Lids' assets and debts accurately reflect Lids' value, and, therefore, we find that the Houlihan Report is not sufficient to rebut the presumption that Lids was insolvent on the Valuation Date.

### 2. Non–financial Indicators

■ In addition to the Houlihan Report, Marathon relies on several other factors which it asserts rebuts the presumption that Lids was insolvent on the Valuation Date. However, unlike the Houlihan Report, Marathon's other arguments are not based on the Balance Sheet Test. Instead, Marathon's arguments are

---

**6.** The Accounts Payable amount of $18,757,000 and Current Liabilities amount of $2,514,000 were properly excluded because both the Market Multiple and Comparable Transactions Methods incorporate in their valuation the assumption of such debt.

based primarily on inferences drawn from Lids' and others' conduct.

First, Marathon asserts that Lids was solvent in October 2000 because every party with a financial interest in Lids treated Lids as a solvent company. For example, Marathon asserts that the contribution by Lids' investors' of $14.9 million in new money in 2000 is an indication that Lids was solvent. Further, Marathon claims that Lids was solvent because it was current with its vendors and continued business as usual with its vendors after the Valuation Date. Marathon also claims that Fleet's continued funding of overadvances on the credit line to Lids prior to and after October 2000, evidences that Lids was solvent on the Valuation Date.

Second, Marathon asserts that Lids was solvent on the Valuation Date because Lids conducted itself as a solvent company. For example, Marathon relies on financial statements prepared by Lids for its Board of Directors, which stated that assets exceeded liabilities in August, September, and October 2000. To further support its argument, Marathon notes that Lids opened 14 new kiosks in August 2000, started a website and added to its line of products, all of which it asserts evidences that Lids was solvent.

Lids disputes Marathon's arguments for several reasons. For example, Lids claims that Marathon's arguments based on Lids' financial statements which were prepared in accordance with GAAP are not determinative of value because GAAP is not controlling for the purposes of determining solvency under section 547(b)(3). Lids also asserts that Marathon has ignored evidence and misrepresented the facts and conduct of Lids and others.

We conclude that Marathon's arguments are based on a subjective evaluation of Lids' solvency rather than the objective test required by section 547(b). Lids' con-

duct and the conduct of third parties are not probative of the value of Lids' assets or liabilities. Marathon has cited no case to support the proposition that a company is solvent simply because other parties believe that it is solvent. Recent failures of companies which were touted by financial analysts as solvent point to the fallacy in Marathon's argument. Furthermore, Marathon has not cited any case to support its argument that Lids was solvent simply because it acted like it was or told others that it was. Marathon's arguments do not rebut the presumption that Lids was insolvent as of the Valuation Date.

Marathon also asserts that Lids was solvent as of the Valuation Date because it did not consider filing for bankruptcy until Fleet restricted its credit line in December 2000. Marathon relies on testimony that Lids filed for bankruptcy because it was unable to secure financing from its lenders and was unable to raise any capital. Based on this testimony, Marathon concludes that because Lids filed for bankruptcy due to that cash crisis, Lids was not insolvent prior thereto on the Valuation Date. However, Lids contends that its crisis with Fleet existed long before the Valuation Date; Lids had been in default on the Fleet line since at least August 2000.

We find Marathon's argument here unconvincing. While Fleet's action restricting the credit available to Lids was the precipitating factor in Lids' filing for bankruptcy, it was not the only factor. Years of poor performance, inability to raise capital, lack of credit, and defaults on agreements with several lenders contributed to Lids' decision to file bankruptcy. Even if Lids' cash crisis did cause its bankruptcy, that does not prove that Lids was solvent until that moment. Many companies are insolvent long before bankruptcy is filed. In fact, section 547 assumes a debtor is

insolvent for at least 90 days before the bankruptcy petition is actually filed.

### 3. *Lids' Pleadings*

 Marathon asserts that all of the initial pleadings filed in Lids' Chapter 11 case provide evidence that Lids was solvent when the petition was filed. Marathon cites Mr. Doyle's affidavit[7] which stated that Lids' assets exceeded liabilities by $10 million as of December 31, 2000. Marathon also notes that the Schedules of Assets and Liabilities filed with the Court evidence Lids' solvency. Lids responds that Mr. Doyle's affidavit and the Schedules were based on book values, not market values. Lids argues that since GAAP-based financials do not determine solvency, Mr. Doyle's affidavit and the Schedules do not prove that Lids was solvent as of the Valuation Date.

As discussed previously, while it is well-established that GAAP may be relevant in section 547 solvency analysis, GAAP is not determinative. Therefore, the pleadings cited by Marathon do not prove that Lids was solvent as of the Valuation Date, and Marathon has failed to rebut the section 547(f) presumption of insolvency.

Marathon also asserts that various motions filed by Lids on the first day of this case (which sought authorization to pay certain vendors for goods already in transit, approval of an employee retention plan and adequate protection payments to a secured creditor) all evidence its solvency. These motions do not prove solvency; they simply evidence Lids' desire to keep its business operating until a buyer could be found. The motions provide no evidence of the fair value of Lids' assets and liabilities and, therefore, do not rebut the presumption of insolvency.

### IV. *CONCLUSION*

For the foregoing reasons, we find that Lids was insolvent at all relevant times, and, therefore, we conclude that the security interest granted to Marathon within 90 days of the Petition Date is avoidable pursuant to section 547 of the Bankruptcy Code.

---

7. John M. Doyle was Lids' Chief Financial Officer at the time the petition was filed.