In re HOFFINGER INDUSTRIES, INC., Debtor.

Hoffinger Industries, Inc., Plaintiff,

v.

Leesa Bunch and McMasker Enterprises, Inc., d/b/a Waterworks Unlimited, Defendants.

Bankruptcy No. 2:01–BK–20514.
Adversary No. 2:03–AP–1134.

United States Bankruptcy Court,
E.D. Arkansas,
Helena Division.

Aug. 27, 2004.

Charles T. Coleman, Wright, Lindsey & Jennings LLP, Little Rock, AR, for the debtor.

Stan D. Smith, for the debtor.

James E. Smith, for Bunch and McMasker.

Whitney A. Davis, Charter, Miller, Davis LLP, Sacramento, CA, for Bunch and McMasker.

Susan Gunter, for Bunch and McMasker.

Jeffrey G. Neven, for McMasker.

James F. Dowden, for the Unsecured Creditor's Committee.

Charles W. Tucker, Assistant United States Trustee.

## OPINION AND ORDER

RICHARD D. TAYLOR, Bankruptcy Judge.

Before the Court is the debtor's Complaint against Leesa Bunch [Bunch] and McMasker Enterprises, Inc. [McMasker] to avoid as preferential transfers under 11 U.S.C. § 547 any judgment liens that may have attached to the debtor's real or personal property located in San Bernadino County, California, or Phillips County, Arkansas. Bunch and McMasker each allege the debtor's solvency at the time the liens attached as an affirmative defense to the debtor's preference action. For the reasons stated below, the Court finds that the debtor was insolvent when the liens attached to the debtor's real or personal property, and avoids as a preferential transfer the registration of the liens in San Bernadino County, California, and Phillips County, Arkansas.

## JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding under 28 U.S.C. § 157(b)(2)(F). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

The debtor manufactures above ground swimming pools, vinyl ladders, filters, and pool accessories with its principal manufacturing facility located in West Helena, Phillips County, Arkansas. As a result of an accident that occurred on August 13, 1993, involving one of the debtor's products, Bunch commenced a civil lawsuit against the debtor. On August 23, 2001, Bunch obtained a judgment against the debtor in the Superior Court of Glenn County, California, in the amount of $12,526,891 plus costs. In the same case, McMasker, the dealer that sold the pool liner to Bunch, also obtained a judgment against the debtor in the amount of $1,000,000 plus costs.

On September 5, 2001, Bunch filed an Abstract of Judgment with the San Bernadino County, California, County Recorder

in the amount of $13,522,177 plus interest. On September 6, 2001, Bunch filed an Affidavit in Support of Registration of Foreign Judgment with the Phillips County, Arkansas, Circuit Clerk. The Circuit Clerk then filed a Notice of Filing of Foreign Judgment in the amount of $13,522,177 plus interest. Bunch has asserted she has liens on personal property and real property of the debtor located in California and Arkansas by virtue of the registration of the judgment in San Bernadino County, California, and Phillips County, Arkansas. No evidence was presented concerning the registration of McMasker's judgment in either California or Arkansas.[1] The debtor filed its chapter 11 voluntary petition on September 13, 2001, and this adversary proceeding on May 1, 2003. Both the Bunch and McMasker judgments are on appeal.

## 11 U.S.C. § 547—PREFERENTIAL TRANSFER

 Under § 547 of the bankruptcy code, a trustee, or a debtor in possession in a chapter 11 case,[2] may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547. According to this section,

any prepetition transfer is preferential and avoidable if five elements of proof are present. The transfer must be made (1) to or for the benefit of a creditor; (2) for or on account of antecedent debt; (3) while the debtor was insolvent; (4) to a noninsider on or within ninety days of the filing of the bankruptcy case; and such transfer must (5) result in the creditor receiving more than the creditor would have received in a hypothetical liquidation in a chapter 7 case.

*Wade v. Midwest Acceptance Corp.* (*In re Wade*), 219 B.R. 815, 818–19 (8th Cir. BAP 1998). The purpose of § 547 is "to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy." *Jones Truck Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund* (*In re Jones Truck Lines, Inc.* [II]), 130 F.3d 323, 326 (8th Cir.1997). Aided by a rebuttable presumption of insolvency, the debtor in possession has the burden of proof regarding these issues. 11 U.S.C. § 547(g).

---

1. McMasker filed a general unsecured claim in the amount of $1,225,000. Debtor's Exhibit H–7: Proof of Claim of McMasker.

2. Section 547(b) makes certain transactions voidable by the trustee. Section 1107(a) gives the debtor in possession the powers of a trustee.

## A. Transfer of Interest

Most of the required elements for a preferential transfer are not in dispute. First, the parties agree that the recording of the judgment in California and Arkansas created a judgment lien resulting in a transfer of an interest of the debtor in property for purposes of § 547. *See, e.g., Madcat Two, Inc. v. Commercial Nat'l Bank of Shreveport (In re Madcat)*, 127 B.R. 206, 211 (Bankr.E.D.Ark.1991)("The creation of a lien is a transfer within the meaning of the Bankruptcy Code ....."). A transfer of a security interest is deemed to be "at the time such transfer is perfected" unless the security interest is perfected within 10 days. 11 U.S.C. § 547(e)(2)(B). In this case, Bunch and McMasker had a judgment entered in their favor on August 23, 2001, in Glenn County, California. On September 5, 2001, Bunch filed her judgment in San Bernadino County, California; and on September 6, 2001, filed her judgment in Phillips County, Arkansas. In both instances, the judgment was perfected more than 10 days after it was entered. Therefore, the transfers occurred on September 5 and 6, 2001.

## B. Antecedent Debt

■ Second, the parties agree that the transfer was to or for the benefit of a creditor, for or on account of an antecedent debt owed by the debtor before such transfer was made. A debt is antecedent for preference purposes if the debt "was incurred before the allegedly preferential transfer." *Jones Truck Lines, Inc.* [II], 130 F.3d at 329. A debt is incurred "on the date upon which the debtor first becomes legally bound to pay." *In re Iowa Premium Serv. Co.*, 695 F.2d 1109, 1111 (8th Cir.1982)(en banc). In both situations, the transfers occurred after the judgment was entered.

## C. Preferential Period

Finally, the parties agree that the creditor is not an insider and that the transfer occurred within 90 days of the filing of the bankruptcy petition. The debtor filed for bankruptcy protection on September 13, 2001. The liens were created on September 5, 2001, and September 6, 2001, clearly within the 90 day preferential period.

## D. Insolvency

At issue in this case is whether the debtor was solvent at the time the California judgment lien was filed in San Bernadino County, California, on September 5, 2001, and in Phillips County, Arkansas, on September 6, 2001. Related to this issue is whether the creditor would receive more in a hypothetical liquidation in a chapter 7 case than it would receive as a result of creating the judgment lien.

■ "Insolvent" is defined in the code as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation ....." 11 U.S.C. § 101(32)(A). The Eighth Circuit has specifically held that insolvency results

> "when the aggregate of a debtor's property is not sufficient at a fair valuation to pay his debts, which means a fair market price that can be made available for payment of debts within a reasonable period of time, and 'fair market value' implies a willing seller and a willing buyer."

*In re Bellanca Aircraft Corp.*, 56 B.R. 339, 385 (Bankr.D.Minn.1985)(quoting *American Nat'l Bank & Trust of Chicago, Illinois v. Bone*, 333 F.2d 984, 987 (8th Cir. 1964)).

■ For purposes of determining whether a preferential transfer occurred, the debtor is presumed to be insolvent on

and during the 90 days immediately preceding the filing of the petition. 11 U.S.C. § 547(f). Although the ultimate burden of proof remains with the debtor in possession, " 'the presumption requires the party against whom the presumption exists to come forward with some evidence to rebut the presumption . . . .' " *Clay v. Traders Bank of Kansas City,* 708 F.2d 1347, 1351 (8th Cir.1983)(quoting the committee notes to § 547(f); *see also* H.R.Rep. No. 595, at 375 (1977), *reprinted in* 1977 U.S.C.C.A.N. 5963, 6139; S. Rep. No. 989, at 89 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5792). The Eighth Circuit only requires some evidence, not substantial evidence, of solvency to offset the presumption of insolvency. *Id.* ("Regardless of whether the district court erroneously applied the substantial evidence test or correctly required [the creditor] to show only some evidence of solvency, . . ."). The Court finds that Bunch presented sufficient evidence to rebut the presumption. This was accomplished when the debtor's president testified that the debtor had suffered a blow, but was a viable operating concern current in its payments to all creditors. Standing alone, this would not be sufficient to rebut the presumption. However, Bunch's cross examination of Michael French [French], a CPA called by the debtor, was sufficient to raise fact questions concerning his liability assumptions, and, thus, shifted the burden. Accordingly, the burden of proof and persuasion remains with the debtor in possession. *Id.* ("The burden of persuasion remains on the party to whom it is allocated under the rules governing the allocation in the first instance")(quoting S.Rep. No. 1277, at 9 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7056).

In order to determine whether the debtor was insolvent on the date of the transfers, the Court must first determine whether the company was a going concern or on its deathbed. *See, generally, In re Taxman Clothing Co.,* 905 F.2d 166 (7th Cir.1990). If the company was a going concern, a balance sheet test, based on the assets at fair valuation, appears to be the appropriate method of valuation. *In re Payless Cashways, Inc.,* 290 B.R. 689, 699 (Bankr.W.D.Mo.2003). On the other hand, if a company was on its deathbed, liquidation value is the appropriate method of valuation. *Bellanca Aircraft Corp.,* 56 B.R. at 387 ("Only where a business is wholly inoperative, defunct, or dead on its feet, will going concern valuation be abandoned in favor of an item by item fair market valuation."). A business is a going concern if it is "actively engaging in business with the expectation of indefinite continuance." Black's Law Dictionary 699 (7th ed.1999); *see also Payless Cashways, Inc.,* 290 B.R. at 702. The Court finds that the debtor was, and still is, a going concern. It continues to operate, maintains a dealer network for the distribution of its products, and incurs trade credit in the performance of its business. *See Jones Truck Lines, Inc. v. Full Service Leasing Corp. (In re Jones Truck Lines, Inc.* [I]), 83 F.3d 253, 258 (8th Cir.1996)(suggesting the following factors as evidence of a going concern: (1) whether the company was operating, (2) whether the officers were optimistic, and (3) whether the managers and lenders continued to invest in the company). As a going concern, the balance sheet test, based on the assets at fair valuation, is the appropriate method of valuation.[3]

---

**3.** Judge Posner recognized the inherent problem concerning the subtleties of going-concern valuation in *In re Taxman Clothing Co.:*

Because not all expected revenues and expected costs are capitalized, a balance sheet (the schedule of assets and liabilities) does not always yield an accurate picture of a

■ Fair valuation refers to the amount of cash that a company could realize from a sale of its property during a reasonable time period. Many courts refer to this method of valuation as balance sheet solvency. *See Taxman Clothing Co.,* 905 F.2d at 169–70; *Payless Cashways, Inc.,* 290 B.R. at 699. However, values assigned to assets by a debtor are not necessarily determinative of their fair value. *Bellanca Aircraft Corp.,* 56 B.R. at 385. These are fact questions for the court to resolve.

Before a applying the balance sheet test, it is perhaps appropriate to recognize that this test is frequently adjusted or modified by the courts in a manner inconsistent with the code's definition of insolvency. These adjustments are generally occasioned by courts seeking to determine a going concern valuation based upon the aggregate value of an entity as an ongoing business, not by assigning values to assets and comparing assets to liabilities. An ongoing business may also include a going concern valuation that would take into account the business's earning power, the availability of customer lists, established supply lines, and other attributes that would allow a buyer to step in and immediately begin operations. *Id.* at 386. The *Bellanca* court also considered goodwill as an element of going concern value. Further, balance sheets may not value all of the debtor's debts to the extent that some of the debtor's contingent liabilities are not assigned a dollar value. *See, e.g., In re*

*Merry–Go–Round Enter., Inc.,* 229 B.R. 337, 342 (Bankr.D.Md.1999).

While this Court acknowledges that it may be inappropriate to deviate from the strict balance sheet test recognized in the Eighth Circuit and mandated by the code's definition of insolvency, some of these asset side factors perhaps should be, and for purposes of this decision will be, considered by this Court as elements appropriately cognizable in determining the fair valuation of a company. This analysis inures to Bunch's benefit, but does not, in this instance, change the final conclusion.

■ In this case, the debtor does have substantial contingent liabilities, relating most frequently to personal injury actions. To fairly determine whether the debtor was solvent or insolvent at the time of the transfers, the Court must assess the value of both assets and liabilities.[4] To properly value a contingent liability, " 'it is necessary to discount it by the probability that the contingency will occur and the liability become real.' " *FDIC v. Bell,* 106 F.3d 258, 264 (8th Cir.1997)(quoting *Xonics Photochemical, Inc.,* 841 F.2d 198, 200 (7th Cir.1988)); *see also Covey v. Commercial Nat'l Bank of Peoria,* 960 F.2d 657, 659–61 (7th Cir.1992)(holding that contingent liabilities should be discounted for the probability that the contingency will occur, and that the valuation after such discounting is made from the debtor's perspective). After the proper valuation of the contingent liability has been determined, it be-

firm's condition. A firm could be solvent in balance-sheet terms yet be in danger of imminent failure. Bankruptcy law ignores these subtleties in the interest of having a clear rule: balance-sheet solvency determines whether the payments to creditors in the present case were voidable preferences. *Taxman Clothing Co.,* 905 F.2d at 169–70.

4. "[W]hen valuing individual assets, or conducting a balance sheet analysis of solvency, the fair market value of the assets is compared to the face value of the liabilities." *Silverman Consulting, Inc. v. Hitachi Power Tools, U.S.A., Ltd. et al. (In re Payless Cashways, Inc.),* 290 B.R. 689, 700 n. 29 (Bankr.W.D.Mo.2003)(quoting *Lids Corp. v. Marathon Inv., Partners, L.P. (In re Lids Corp.),* 281 B.R. 535, 545 (Bankr.D.Del. 2002)).

comes a factor in the Court's balance sheet insolvency test.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In order to determine whether the debtor can avoid Bunch's liens on the debtor's real and personal property as preferential transfers, the Court must determine whether the debtor was solvent at the time of the transfers, which occurred on September 5 and 6, 2001. The best evidence presented to the Court of the debtor's financial position on September 5 and 6 is the balance sheet offered by the debtor as Exhibit H–36. That balance sheet purports to reflect the fair value of the debtor's assets and liabilities as of August 31, 2001, less than one week prior to the transfers.

### A. Liabilities

The Court will begin its analysis of the financial picture of the debtor on the liability side of the balance sheet. Exhibit H–36 reflects total liabilities as of August 31, 2001, in the amount of $48,426,422, as follows:

CURRENT LIABILITIES

| | |
|---|---|
| Trade Accounts Payable | 1,234,281 |
| Accrued Interest | 557,908 |
| Accrued Product Liability Legal Claims | 31,179,111 |
| Accrued Product Liability Premiums | 0 |
| Accrued Payroll, Holiday, Vacation, WC & GLH | 134,086 |
| Accrued Property Taxes | 0 |
| Accrued Freight | 0 |
| Other Accrued Liabilities | 114,505 |
| Accrued Commissions & Warranties | 55,133 |
| Obligation to Completion of Contracts in Process | 911,996 |
| Claims Obligations—(Not Product Related) | 898,994 |
| Obligations on Lease Commitments | 631,208 |
| Sub–Total | 35,717,222 |

LONG–TERM LIABILITIES

| | |
|---|---|
| Building Loan—Commercial | 2,149,200 |
| Related Party Notes Payable | 10,560,000 |
| Sub–Total | 12,709,200 |
| TOTAL LIABILITIES | 48,426,422 |

Bunch raised several issues relating to the liability figures that appear on the balance sheet. First, Bunch objected to the figure used on the balance sheet for Accrued Product Liability Legal Claims [Legal Claims]. The Legal Claims listed were adjusted upward $14,450,816 from the debtor's internal records, which reflected Legal Claims in the amount of $16,728,295. According to French, a CPA with Moore Stevens, the firm that handled the debtor's audits since 1995, the reason for the adjustment was to include estimated future claims against the debtor based on an actuarial analysis prepared by Charles C. Pearl, Jr. [Pearl], Milliman USA.[5] Pearl's report detailing the analysis projected the debtor's potential future liability as of September 13, 2001, based on data available to him through September 30, 2003. The report consisted of four components: (1) Arrowhead Insurance Company, Ltd.'s [Arrowhead] ultimate losses and reserves, in the amount of $1,744,041; (2) Hoffinger's retained (uninsured) claims-made losses and reserves, in the amount of $20,499,672 [Component A];[6] (3) Hoffinger's retained occurrence tail liability, in the amount of $5,421,485 [Component B];[7] and (4) Hoffinger's product year tail exposure, in the amount of $5,257,954 [Component C].[8] The total projected liability of the four components is $32,923,152. Removing Arrowhead from

5. Debtor's Exhibit H–25: Actuarial Analysis of Products Liability Exposure at 9/13/2001.

6. This component includes all claims and accidents that have occurred as of September 13, 2001, that the debtor is aware of.

7. This component represents the debtor's liability for accidents that have occurred as of

September 13, 2001, but have not been reported to the debtor.

8. This component represents accidents that have not occurred as of September 13, 2001, but involve the debtor's products that were sold prior to September 13, 2001.

the projection leaves a total projected liability of $31,179,111, which is the amount used by French in Exhibit H–36. Components A, B, and C are all based on projections by Pearl of the amounts that the debtor will eventually have to pay in each category, including any legal fees and costs.

■ Obviously, the report does not list every contingent liability to which the debtor may be exposed. A contingent liability is "[a] liability that will occur only if a specific event happens; a liability that depends on the occurrence of a future and uncertain event." Black's Law Dictionary 926 (7th ed.1999). By definition, the debtor may have a contingent liability in every pool and pool liner it sold prior to September 13, 2001. Pearl has taken the debtor's contingent liabilities and reduced them to a predicted future liability amount based on the past performance of the debtor. Thus, he has reduced the debtor's contingent liabilities by the probability that the contingency will occur, resulting in the figure used by French in Exhibit H–36.

■ However, including Components A, B, and C on the liability side of the balance sheet does not provide an accurate picture of the existing claims, known and unknown, at the time the transfers occurred. Component A includes claims and accidents that occurred prior to September 13, 2001, and of which the debtor was aware, reduced to a predicted future liability based on the history of the debtor. Component B also includes claims and accidents that have occurred prior to September 13, 2001, but of which the debtor was not aware. Again, Component B has been reduced to a predicted future liability based on the past performance of the debtor. Component A and B include all potential claims existing against the debtor as of September 13, 2001. On the other hand, Component C represents claims that may occur in the future based on the sale of the debtor's product prior to September 13, 2001. Although Pearl may have reasonably estimated the amount of these potential future claims, there was no injury or claim against the debtor as of September 13, 2001. The Court must review a "snapshot" of the balance sheet as of the date of transfers to determine the solvency of the debtor corporation. Because of this, Component C claims cannot be included in the balance sheet. The Court is aware that if the company were, in fact, being sold to a third party, Component C might be taken into consideration to determine the appropriate value of the company. However, bankruptcy law requires the Court to look at the balance sheet solvency as of the date of the transfers. That view does not include potential future claims.

Although Bunch objects to the amount of predicted future liability, she did not introduce any evidence, including expert testimony, to contradict Pearl's testimony. The Court finds the testimony of Pearl credible and uncontroverted, and, accordingly, finds that the fair value of the Legal Claims representing Components A and B is reasonable. The Court will strike Component C from the balance sheet.

Second, Bunch also objected to the Obligation to Completion of Contracts in Process entry on the balance sheet. French testified that the $911,996 figure that appears on the balance sheet is based on the cost to complete a 56,000 square foot warehouse in Rancho Cucamonga, California. The remaining amount due on the construction contract at the time the debtor filed its bankruptcy petition was $1,681,996. According to the appraisal and testimony of John Penner, Penner & Associates, the cost to complete the building as of September 9, 2001, was $770,000. Subtracting the cost to complete the building from the total amount due on the contract

resulted in an obligation by the debtor in the amount of $911,996, the amount used on Exhibit H–36. Again, Bunch offered no evidence to contradict this determination, and the Court finds that the fair value of the Obligation to Completion of Contracts in Process as stated on the balance sheet is reasonable.

Third, Bunch also objected to the Claims Obligations—(Not Product Liability Related) entry on the balance sheet. This figure consists of a products liability claim of AUREA, Inc. [AUREA] in the amount of $474,702; an arbitration award relating to a pension fund in favor of Robert J. Rao and other parties [Rao] in the amount of $349,292; and a medical expense claim of the estate of Don Wofford [Wofford] in the amount of $75,000. The AUREA claim related to the use of the debtor's pool liners in a fish farming operation. Because of alleged shrinkage when the pools were empty, AUREA brought a breach of warranty claim against the debtor. An award of arbitration was issued on July 12, 2001, in favor of AUREA. Wayne Hollowel [Hollowel], president of the debtor, testified that he understood Arrowhead provided coverage for product liability tort injury only, but also stated that the AUREA claim may be paid by Arrowhead. Marty Hoffinger [Hoffinger], chairman of the board of the debtor and a director of Arrowhead, testified that he did not believe Arrowhead would cover the product liability claim. Don Bendure [Bendure], an expert called by Bunch, stated that breach of warranty claims would not be covered under the Arrowhead policy, but that property damage from a breach of warranty may be covered. Regardless, Bunch did not dispute the liability of the debtor regarding the claim of AUREA; if Arrowhead was able to provide any coverage for the claim, it would appear as a receivable on the asset side of the balance sheet and will be addressed by the Court later in this opinion. Likewise, Bunch did not dispute the claim of Rao or Wofford, and the Court accepts those claims as presented on the balance sheet.

Fourth, Bunch also objected to the Obligations on Lease Commitments entry on the balance sheet. According to French, the $631,208 figure that appears on the balance sheet relates to copier leases, and is based on two proofs of claims filed by De Lage Landen Financial Services [De Lage][9]. Hollowel testified that the debtor rejected the leases post-petition and returned the equipment. When questioned by the Court, French stated that the copier lease damages typically would be an off-balance sheet liability and would not have been disclosed under Generally Accepted Accounting Principles. However, he did state that he believed it would be fair to include that amount to determine a sale price for the company. The Court finds that the rejection of the leases mitigates against the inclusion of the entire balance of the lease damages being included as a liability of the debtor on the operative preference date. Further, as discussed above, the sale price for the company is not the code dictated standard for determining insolvency. Neither side presented evidence of the pre-petition damages due De Lage. Accordingly, the Court will strike this entry from the balance sheet.

Fifth and finally, Bunch also objected to the Related Party Notes Payable entry on the balance sheet. On August 4, 1999, the debtor borrowed $10,000,000 from JM Capital Finance Company, Ltd. [JM Capital]. At the time of the loan, Peter Caplin, Hoffinger's son-in-law, was the president of JM Capital. According to Hoffinger, the loan was used to pay off an existing

---

**9.** Debtor's Exhibit H–30: Proof of Claim of De Lage.

loan the debtor had with Clinton Pool Company that had a balance due of $8,250,000. The remaining $1,750,000 was distributed to the debtor's shareholders. According to Bunch, because the debtor's shareholders only received $1,750,000, just that amount should be reflected on the balance sheet. Bunch offered no further evidence in support of her contention. Solely for the purpose of determining the issue of solvency, the Court finds that the Related Party Notes Payable is justified and reasonable and accepts that entry as reflected on the balance sheet.

■ There were two additional corrections that French, the expert witness for the debtor, noted. First, based on his review of the records, French believed that one of the Component A claims had been reduced twice on the balance sheet, which would result in an increase of $500,000 on the liability side. No further evidence was presented in this regard and the Court will not make an adjustment to the balance sheet. Second, if a sale of assets did take place, French testified that the debtor would incur approximately $1,370,000 in additional tax liability that is not reflected on the balance sheet. However, the determination of fair value of the debtor's property does not contemplate the sale of an on-going business. In the absence of that sale, the hypothetical tax liability would not be incurred by the debtor, and should not be included on the balance sheet.

Based on the information presented above, the Court finds that the debtor's balance sheet showing a fair statement of the debtor's liabilities as of August 31, 2001, totals $42,537,260:

CURRENT LIABILITIES

| | |
|---|---|
| Trade Accounts Payable | 1,234,281 |
| Accrued Interest | 557,908 |
| Accrued Product Liability Legal Claims [less Component C ] | 25,921,157 |
| Accrued Product Liability Premiums | 0 |
| Accrued Payroll, Holiday, Vacation, WC & GLH | 134,086 |
| Accrued Property Taxes | 0 |
| Accrued Freight | 0 |
| Other Accrued Liabilities | 114,505 |
| Accrued Commissions & Warranties | 55,133 |
| Obligation to Completion of Contracts in Process | 911,996 |
| Claims Obligations—(Not Product Related) | 898,994 |
| ~~Obligations on Lease Commitments~~ | ~~631,208~~ |
| Sub–Total | 29,828,060 |

LONG–TERM LIABILITIES

| | |
|---|---|
| Building Loan—Commercial | 2,149,200 |
| Related Party Notes Payable | 10,560,000 |
| Sub–Total | 12,709,200 |

| | |
|---|---|
| TOTAL LIABILITIES | 42,537,260 |

## B. Assets

Exhibit H–36 reflects total assets as of August 31, 2001, in the amount of $33,069,438, as follows:

CURRENT ASSETS

| | |
|---|---|
| Cash & Securities | 1,928,961 |
| Trade Accounts Receivable | 4,906,760 |
| Allowance For Doubtful Accounts | (550,315) |
| Inventories | 13,262,876 |
| Reserve For Obsolesence | (1,000,000) |
| Other Assets | 664,167 |
| Sub–Total | 19,212,449 |

NET ASSETS

| | |
|---|---|
| Net M & E, Tools, Dies and Molds | 3,709,500 |
| Net Autos & Trucks | 56,685 |
| Net Furniture & Fixtures | 300,000 |
| Net Property & Buildings | 3,175,000 |
| Undeveloped Land—FL | 682,500 |
| Land and Building—CA | 5,000,000 |
| Construction in Process | 30,000 |
| Sub–Total | 12,953,685 |

| | |
|---|---|
| Brooklyn Mortgage (Includes current portion) | 903,304 |
| TOTAL ASSETS | 33,069,438 |

On its face, the debtor's total liabilities exceed its total assets by $9,467,822, a situation which renders the debtor insolvent as of August 31, 2001, less than one week prior to the alleged preferential transfers. However, based on the testimony and evidence received at the trial, the Court finds that certain adjustments to the assets may be appropriate.

French testified that he made no adjustments to the current assets as listed on the balance sheet. Bunch did question the amount of cash and securities that are listed, but failed to present any proof that would allow the Court to increase the listed figure. French did adjust some of the

net assets based on information he received that changed the debtor's internal figures. The first of these were based on three appraisals concerning the debtor's real and personal property.

First, the debtor presented the appraisal of Ronald E. Bragg [Bragg], who valued the market value of the debtor's real property located in Helena, Arkansas, as of March 13, 2002, at $3,175,000. Bragg testified that there would be no significant change in the value of the property between September 1, 2001, and March 13, 2002. Although Bunch questioned the use of a 12% capitalization rate to determine the potential income of the property, Bunch did not present her own expert or any credible evidence to refute the appraised value of the property given by Bragg.

Next, the debtor presented the appraisal of John Penner [Penner], who valued the market value of the debtor's real property located in California as of September 1, 2001, at $5,000,000. On cross-examination, Penner testified that it would cost more than $5,000,000 to rebuild the property, but emphasized that his figure was based on the market value of the property, not the cost to rebuild. Penner gave more weight to his comparable sales analysis and income approach than to his cost approach to determine the market value of the property. Again, Bunch did not present her own expert or any other evidence to refute the appraised value of the property given by Penner.

Finally, the debtor presented the appraisal of Jack Beckwith [Beckwith], who valued the fair market value of the equipment, office furniture, and rolling stock of the debtor located in Helena, Arkansas. His appraised value as of February 15, 2002, based on a continued use of the property, is $3,709,500. Beckwith was reluctant to say that the value of the proper-

ty as of September 1, 2001, would have been the same as of February 15, 2002. He stated that no California personal property, fixtures, or titled vehicles were included in his appraisal, but later testified that everything was included in his appraisal except the licensed vehicles. Again, Bunch did not present her own expert or any other evidence to refute the appraised value of the property given by Beckwith. The Court finds that the three appraisals are reasonable and will not adjust the entries on the balance sheet.

Although Beckwith testified that licensed vehicles were not included in his appraisals, Autos and Trucks is a line item on the balance sheet, and reflects a fair value of $56,685, which, according to the notes to the balance sheet, is also the book value of the Autos and Trucks. According to the debtor's 2001 Financial Statements and Accountants' Review Report, which the Court received as Exhibit H–9, the value of the debtor's Autos and Trucks was listed at $353,479, less accumulated depreciation. Neither side presented any other evidence of the value of the vehicles. Accordingly, the Court accepts the figure contained on the balance sheet regarding the value of the licensed vehicles.

The next item on the balance sheet is Net Furniture & Fixtures. According to the notes to the balance sheet, the fair value is based primarily on the sale of Environmental Products [EPD], a division of the debtor, for $273,000. As of the date of the alleged preferential transfers, EPD had not been sold and remained an asset of the debtor. There are two contradictory pieces of evidence relating to the value of EPD as of the date of the transfers. The first is the $273,000 listed on the note to the balance sheet. The second is the spread sheet that was introduced relating to the sale of EPD, which the Court received as Exhibit H–34. According to Ex-

hibit H–34, the adjusted sale price of EPD at February 2, 2002, was $1,461,406, which is $1,188,406 more than the fair value listed on the balance sheet. It is inconceivable to the Court that the value of EPD would increase more than a million dollars in five months. Without determining what the true value of EPD was as of the date of the transfers, for the purpose of determining whether the debtor was solvent on that date the Court will use the sale price of EPD as reflected on Exhibit H–34, and increase the amount of Net Furniture and Fixtures by $1,188,406.

The next item on the balance sheet is Undeveloped Land—FL. This entry relates to two tracts of land in Florida. The first tract is valued at $97,500 based on an assessor's 2002 market value estimate. The assessment record was received as a business record, but not as evidence of the value of the property. No other evidence was presented by either side regarding the value of the first tract. The second tract is valued at $560,000, which is the amount the land was purchased for in 2000. The second tract of property was sold postpetition to Aquatic Eco Systems for $580,000. Again, without determining the actual value of the second tract of land, for purposes of determining whether the debtor was solvent at the time of the alleged preferential transfers the Court will use the sale price of the second tract to determine its fair value. Accordingly, the Court will increase the amount of Undeveloped Land—FL by $20,000.

The last adjustments to fair market value related to Construction in Process and Brooklyn Mortgage. A note to the balance sheet relating to the Construction in Process figure indicates that the debtor's Construction in Process figure of $3,513,085 was reduced to $30,000 based on the appraisal of the California property. According to the balance sheet, the re-

maining $30,000 consists primarily of China Tooling. French testified that the Brooklyn Mortgage was adjusted to correct entries. No other evidence was presented relating to either of these entries.

Taking into account the adjustments made by the Court, the resulting balance sheet reflects total assets in the amount of $34,277,844, still well under the amount of the debtor's liabilities of $42,537,260 as determined above:

| CURRENT ASSETS | |
| --- | --- |
| Cash & Securities | 1,928,961 |
| Trade Accounts Receivable | 4,906,760 |
| Allowance For Doubtful Accounts | (550,315) |
| Inventories | 13,262,876 |
| Reserve For Obsolesence | (1,000,000) |
| Other Assets | 664,167 |
| Sub–Total | 19,212,449 |
| | |
| NET ASSETS | |
| Net M & E, Tools, Dies and Molds | 3,709,500 |
| Net Autos & Trucks | 56,685 |
| Net Furniture & Fixtures | 1,488,406 |
| Net Property & Buildings | 3,175,000 |
| Undeveloped Land—FL | 702,500 |
| Land and Building—CA | 5,000,000 |
| Construction in Process | 30,000 |
| Sub–Total | 14,162,091 |
| Brooklyn Mortgage (Includes current portion) | 903,304 |
| | |
| TOTAL ASSETS | 34,277,844 |

Bunch also raised a number of additional issues relating to the assets of the debtor that the Court will discuss below. The Court's discussion of these issues relates only to the determination of solvency of the debtor as of the date of the alleged preferential transfers and is not a finding of fact with regard to any of the issues raised unless so noted by the Court.

The most significant issue raised by Bunch related to the amount of insurance premiums the debtor pays. According to Bendure, an expert who testified concerning the insurance premiums, the debtor had a potential excess redundancy of approximately $15,680,000 as of 2001. The excess redundancy is based on a comparison of the premiums paid by the debtor over what was actually required for claims and expenses. This was determined after Bendure estimated a reasonable premium

based on the debtor's experience. Bendure substituted Pearl's loss data and exposure figures for his own estimates and determined an excess redundancy of $15,278,000. Further, under the terms of the insurance policy with Arrowhead,[10] the debtor may have been entitled to a retrospective return premium based on the excess redundancy. The retrospective premium endorsement allows for the refund of up to 20% of the excess redundancy. According to Bendure, using Pearl's loss data and exposure figures, that would amount to a refund to the debtor of $3,468,804, reflecting present value as of 2001.

Bunch also questioned the lack of any going concern value, goodwill, or general intangibles listed on the balance sheet. These items concern the debtor's earning power, availability of customer lists, established supply lines, trademarks, and other attributes that may enhance the value of the company. Hoffinger testified that he considered the Doughboy and Lomart trademarks, which are owned by the debtor, as assets of the company. The only other evidence of going concern value, goodwill, or general intangibles came from the unrefuted testimony of French. According to French, even though management considered the trademarks valuable, French did not assign any value to them because they had no earnings potential. Likewise, because there was no excess income and the distributions to equity security holders fluctuate, French could not ascribe any value to general intangibles or goodwill. Bunch offered no evidence of the potential value of goodwill, general intangibles, or going concern value. Consequently, the Court will not assign a value to these attributes.

Bunch also wanted to include as potential assets of the debtor the payments to the debtor from Arrowhead relating to the Bunch/McMasker claim and the Coyle claim, and the future payments from Arrowhead relating to the Reneau and Rouse claims.[11] It is unclear whether any of these payments are already included in the Cash & Securities line of the balance sheet. French did testify that he believed the Coyle claim had been reduced twice on the asset side and, to be accurate, the balance sheet should include an additional liability of $500,000. If the Arrowhead payments are included with the assets on the balance sheet, the assets would increase by $500,000 a claim, or $2,000,000.

Finally, according to Bunch, the assets should also include (1) a $141,787 judgment in favor of the debtor against Brad Rinehart, the past-president of the debtor; (2) undisclosed potential tax benefits the debtor may receive as a result of any losses the debtor incurs; and (3) $424,703 if Arrowhead pays the AUREA claim. Without any evidence or testimony of the potential tax benefit, the Court cannot include that asset in its computation, nor is it appropriate in a balance sheet analysis. The Court also has concerns about the inclusion of the judgment against the past-president and the possible Arrowhead payment. French testified that he would not include the judgment amount on the balance sheet without first determining whether the judgment was collectable. The figure involved was not a known or even projected quantity on the operative pre-petition date. Further, as discussed above, it appears the AUREA claim is a breach of warranty action and will not be covered by Arrowhead. Regardless, the Court will include

10. Defendant's Exhibit 7: Indemnification Policy For Product Liability Coverage.

11. The Coyle, Reneau, and Rouse claims are known claims against the debtor and are included in Component A in Pearl's report.

the Rineheart judgment and the AUREA claim in its determination of the debtor's solvency to view this issue in the light most favorable to Bunch.

By adding the retrospective return premium, the potential Arrowhead payments for the four claims and the AUREA judgment, and the judgment against Reinheart to the asset side of the balance sheet, the debtor's assets increase from $34,277,844 to $40,313,138. However, when compared to the debtor's liabilities in the amount of $42,537,260, the debtor's debts remain greater than its property, at fair valuation. Therefore, the Court finds that the debtor was insolvent at the time the transfers occurred on September 5 and 6, 2001.

The remaining issue for the Court is whether Bunch would receive more in a hypothetical liquidation in a chapter 7 case than she would receive as a result of creating the judgment lien. The law is generally well settled that unless creditors would receive a 100% payout, " 'any unsecured creditor who receives a payment during the preference period is in a position to receive more than it would have received under a Chapter 7 liquidation.' " *RDM Holdings, Inc. v. DMAC Invs., Inc. (In re RDM Sports Group, Inc.)*, 250 B.R. 805, 814 (Bankr.N.D.Ga.2000)(quoting *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 465 (6th Cir.1991)); *see also Zachman Homes, Inc. v. Oredson (In re Zachman Homes, Inc.)*, 40 B.R. 171, 173 (Bankr.D.Minn. 1984)(same). Even taking the debtor's assets at fair value rather than liquidation value, it is clear that the unsecured creditors in this case will receive less than a 100% distribution. Because of this, the Court finds that as a result of the creation of the liens, Bunch received more than she would receive if the transfer had not been made, the case were a chapter 7 proceed-

ing, and Bunch received payment on her claims as provided for in the bankruptcy code.

Based on the findings of fact and conclusions of law stated above, the Court finds that the registration of Bunch's judgment in San Bernadino County, California, and Phillips County, Arkansas, was a preferential transfer as defined in the bankruptcy code, and can be, and hereby is, avoided by the debtor.

IT IS SO ORDERED.