**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2887
_____

In re:  HOMEBANC MORTGAGE CORP., et al,
Debtors


WELLS FARGO, N.A., in its capacity as Securities
Administrator

v.

BEAR STEARNS & CO., INC.;
BEAR STEARNS INTERNATIONAL LIMITED;
HOMEBANC CORP.;
STRATEGIC MORTGAGE OPPORTUNITIES REIT, INC.


GEORGE L. MILLER, Chapter 7 Trustee for the Estate of
HomeBanc Corp.,
Appellant
_____

On Appeal from the United States District Court
for the District of Delaware

District Court No. 1-17-cv-00797
District Judge: The Honorable Richard G. Andrews

Argued September 26, 2019

Before: SMITH, *Chief Judge,* McKEE, and PHIPPS,
*Circuit Judges*

(Opinion Filed:  December 24, 2019)


Francesca E. Brody
Sidley Austin
787 Seventh Avenue
New York, NY 10019

James O. Heyworth          **[ARGUED]**
Sidley Austin
787 Seventh Avenue
New York, NY 10019

Andrew W. Stern
Sidley Austin
787 Seventh Avenue
New York, NY 10019

      *Counsel for Bear Stearns Co., Inc.*
          *Bear Stearns International Ltd.*
          *Strategic Mortgage Opportunities REIT,*
          *Inc.*

John T. Carroll, III
Cozen O'Connor
1201 North Market Street
Suite 1001
Wilmington, DE 19801

Steven M. Coren      **[ARGUED]**
Kaufman Coren & Ress
2001 Market Street
Two Commerce Square, Suite 3900
Philadelphia, PA 19103

John W. Morris
Kaufman Coren & Ress
2001 Market Street
Two Commerce Square
Philadelphia, PA 19103
     *Counsel for George L. Miller, Chapter 7 Trustee for*
     *the Estate of HomeBanc Corp.*

---

OPINION

---

SMITH, *Chief Judge.*

This appeal revolves around the liquidation of defaulted mortgage-backed securities that were subject to two repurchase

agreements. Following multiple rounds of litigation before the Bankruptcy and District Courts, George E. Miller, Chapter 7 trustee for the estate of HomeBanc Corp., seeks our review. On appeal, we address these questions: (1) whether a Bankruptcy Court's determination of good faith regarding an obligatory post-default valuation of mortgage-backed securities subject to a repurchase agreement receives plenary review as a question of law or clear-error review as a question of fact; (2) whether "damages," as described in 11 U.S.C. § 101(47)(A)(v), requires a non-breaching party to bring a legal claim for damages or merely experience a post-liquidation loss for the conditions of 11 U.S.C. § 562 to apply; (3) whether the safe harbor protections of 11 U.S.C. § 559 can apply to a non-breaching party that has no excess proceeds after exercising the contractual right to liquidate a repurchase agreement; and (4) whether Bear Stearns liquidated the securities at issue in compliance with the terms of the parties' repurchase agreements. Because we agree with the disposition of the District Court, we will affirm.

# I

HomeBanc Corp. ("HomeBanc") was in the business of originating, securitizing, and servicing residential mortgage loans. From 2005 through 2007, HomeBanc obtained financing from Bear Stearns & Co., Inc. and Bear Stearns International Ltd. (jointly referred to as "Bear Stearns") pursuant to two repurchase agreements:[1] a Master Repurchase

---

[1] A repurchase agreement, typically referred to as a "repo," is "[a] short-term loan agreement by which one party sells a security to another party but promises to buy back the security

4

Agreement ("MRA") dated September 19, 2005 and a Global Master Repurchasing Agreement ("GMRA") dated October 4, 2005.[2] Transactions were accompanied by a confirmation that included the purchase date, purchase price, repurchase date, and pricing rate. HomeBanc transferred to Bear Stearns multiple securities in June 2006, June 2007, and July 2007; however, nine of the securities—the securities at issue ("SAI")—were accompanied by confirmations showing a purchase price of zero and open repurchase dates.[3]

On Tuesday, August 7, 2007, HomeBanc's repo transactions became due, requiring HomeBanc to buy back thirty-seven outstanding securities, including the nine SAI, at an aggregate price of approximately $64 million. Bear Stearns, concerned about HomeBanc's liquidity, offered to roll (extend) the repurchase deadline for an immediate payment of roughly $27 million. Bear Stearns alternatively offered to purchase thirty-six of the securities outright for approximately $60.5 million, but HomeBanc rejected this proposal. HomeBanc failed to repurchase the securities or pay for an extension of the due date by the close of business on August 7. The following afternoon, Bear Stearns issued a notice of default that gave HomeBanc until the close of business on Thursday, August 9, 2007, to make payment in full. No funds were forthcoming. Consequently, Bear Stearns sent formal default notices to

on a specified date at a specified price." *Repurchase Agreement*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[2] Bear Stearns held the nine securities at issue ("SAI") in this case under the GMRA.

[3] An "open repurchase date" means that the security is payable on demand.

HomeBanc on August 9, 2007, and later that day, HomeBanc filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code.[4]

Upon HomeBanc's default, the MRA and GMRA required Bear Stearns to determine the value of the thirty-seven remaining repo securities. This meant that Bear Stearns, within its broad discretion, had to reach a "reasonable opinion" regarding the securities' "fair market value, having regard to such pricing sources and methods . . . as [it] . . . consider[ed] appropriate." J.A. 1038.

Bear Stearns, claiming outright ownership of the securities, decided to auction them to determine their fair market value. Auction solicitations were distributed between the morning of Friday, August 10 and Tuesday, August 14, stating that Bear Stearns intended to auction thirty-six of the securities on August 14, 2017.[5] The bid solicitations listed the available securities, including their unique CUSIP identifiers,

---

[4] The bankruptcy was later converted to a Chapter 7 proceeding in February 2009.

[5] One of the thirty-seven remaining securities was excluded from the August 14, 2007 auction because J.P. Morgan had agreed with HomeBanc to purchase the security for $1 million. Ultimately, J.P. Morgan did not buy the security, and as a result, it was subsequently auctioned on August 17, 2007. Bear Stearns's mortgage trading desk submitted the highest bid, purchasing the security for $1,256,000.

original face values, and current factors.[6] Bear Stearns's finance desk sent the bid solicitation to approximately 200 different entities, including investment banks and advisors, pension and hedge funds, asset managers, and real estate investment trusts. In some cases, multiple individuals within a single entity were solicited. The finance desk also sought bids from Bear Stearns's mortgage trading desk, implementing extra safeguards to prevent any insider advantage.

The auction yielded two bids. Tricadia Capital, LLC submitted a bid of approximately $2.2 million for two securities, and Bear Stearns's mortgage trading desk placed an "all or nothing" bid of $60.5 million, the same amount Bear Stearns had offered before HomeBanc's default. After the auction closed, Bear Stearns's finance desk determined that Bear Stearns's mortgage trading desk had won. Bear Stearns allocated the bid across the thirty-six securities on August 15: $52.4 million to twenty-seven securities and $8.1 million divided evenly among the nine SAI ($900,000 apiece).

Despite its default and the results of the auction, HomeBanc believed itself entitled to the August 2007 principal and interest payments from the thirty-seven securities; Bear Stearns disagreed. Wells Fargo Bank, administratively holding the securities, commenced this adversary proceeding by filing an interpleader complaint on October 25, 2007. HomeBanc and Bear Stearns asserted cross-claims against each other. After depositing the August 2007 payment with the

---

[6] A CUSIP is a nine-digit numeric or alphanumeric code that identifies financial securities to facilitate clearing and settlement of trades.

Bankruptcy Court, Wells Fargo was subsequently dismissed from the proceedings. The cross-claims between HomeBanc and Bear Stearns remained.

### A. HomeBanc I[7]

After HomeBanc's bankruptcy was converted to a Chapter 7 proceeding, George Miller was appointed as trustee for the estate. Miller brought several claims against Bear Stearns, including (1) conversion (for selling the SAI via auction when HomeBanc asserted that it had superior title and interest), (2) violation of the automatic bankruptcy stay (by auctioning the SAI), and (3) breach of contract (for improperly valuing the SAI in violation of the GMRA).

With respect to these three claims, the Bankruptcy Court granted Bear Stearns's motion for summary judgment. When a bankruptcy petition is filed, an automatic stay halts any actions by creditors. 11 U.S.C. § 362. However, § 559 generally allows repo participants to exercise a contractual right to liquidate securities without judicial interference. 11 U.S.C. § 559. The Bankruptcy Court held that the transactions underlying the nine SAI constituted repurchase agreements under 11 U.S.C. § 101(47)(A)(i) and (v), bringing the SAI within the safe harbor protections of § 559. Thus, Bear Stearns had the right to liquidate the securities: it did not violate the automatic bankruptcy stay or convert the securities. *See* J.A.

---

[7] There are four decisions relevant to this appeal that the parties denote as HomeBanc I, Home Banc II, HomeBanc III, and HomeBanc IV. We make reference to those decisions in like manner.

44-45 ("Bankruptcy Code § 559 permits liquidation of securities in accordance with a party's contractual rights, and the GMRA permits the Bear Stearns defendants to act within their discretion" to sell the securities upon default.).

The Bankruptcy Court also entered summary judgment against HomeBanc on the breach of contract claim. Interpreting the GMRA, which is governed by English contract law, the Bankruptcy Court noted that while the agreement required Bear Stearns to rationally appraise the SAI in good faith, Bear Stearns had sizeable discretion in coming to a fair market valuation. Due to this broad discretion, the Court held that there was no dispute of material fact as to whether Bear Stearns complied with the GMRA since using a bidding process to value securities was typical practice in the industry at the time.

## B. HomeBanc II

HomeBanc appealed to the District Court, arguing that the Bankruptcy Court erred by (1) determining that the transactions involving the SAI qualified as repurchase agreements entitled to the safe harbor protections of § 559; (2) interpreting the GMRA to impose a nonexistent subjective rationality standard for Bear Stearns to value the securities upon HomeBanc's default; and (3) deciding that the sale of the SAI was rational and in good faith.

The District Court affirmed on the first two issues but remanded for further proceedings as to whether Bear Stearns complied with the GMRA in good faith. First, the District Court decided that the transactions underlying the SAI did not

9

qualify as repos under § 101(47)(A)(i) because the confirmations accompanying the transactions showed that the securities had a purchase price of zero, allowing the SAI to "have been transferred back . . . without being 'against the transfer of funds . . . .'"[8] J.A. 59-60. Instead, they were credit enhancements under § 101(47)(A)(v).[9] "There is no doubt that

---

[8] 11 U.S.C. § 101(47)(A)(i), (v) ("The term 'repurchase agreement' (which definition also applies to a reverse repurchase agreement)-- (A) means--
(i) an agreement . . . which provides for the transfer of one or more . . . mortgage related securities . . . **against the transfer of funds** . . . with a simultaneous agreement by such transferee to transfer to the transferor thereof . . . interests of the kind described in this clause, at a date certain not later than 1 year after such transfer or on demand, against the transfer of funds . . . ;
(v) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in clause (i), (ii), (iii), or (iv) . . . .") (emphasis added).
[9] Although the Bankruptcy Code does not define "credit enhancement," the term encompasses various ways that a borrower may improve its credit standing and reassure lenders that it will honor its debt obligations. *See Credit Enhancement*, OXFORD DICTIONARY OF FINANCE AND BANKING (2014). Here, the District Court held that HomeBanc engaged in "credit enhancement" by providing additional collateral to Bear Stearns with a purchase price of zero. *See Overcollateralization*, THE PALGRAVE MACMILLAN DICTIONARY OF FINANCE, INVESTMENT AND BANKING (1st ed. 2010).

10

the disputed transactions were part and parcel of their undisputed repo transactions. It therefore seems to me that the extra securities were plainly within the umbrella of 'credit enhancements.'" J.A. 60 (quoting 11 U.S.C. § 101(47)(A)(v)). While the nine SAI were credit enhancements rather than traditional repos,[10] the District Court still held that they received the protections of § 559.

As to HomeBanc's second claim, the District Court decided that the Bankruptcy Court correctly discerned the relevant English law, finding that the GMRA's "reasonable opinion" language equated to a "good faith" requirement.

The Court, responding to HomeBanc's last argument, held that the record created a fact question as to whether Bear Stearns acted in good faith by auctioning the SAI. Two concerns led to this decision. First, only Bear Stearns submitted a bid that included the nine SAI. J.A. 62 ("When . . . Bear Stearns was the winning bidder because it was the only bidder, I think that is indisputable evidence that the market was not working, or that there was something else wrong with the auction process."). Second, the District Court believed that the Bankruptcy Judge erroneously discounted the opinion of HomeBanc's expert witness, who stated that Bear Stearns designed the auction to dissuade outside bidders. Because of these issues, the case was remanded for further proceedings to determine if the auction complied with the GMRA.

---

[10] The District Court concluded that the other twenty-eight of the thirty-seven securities were traditional repos under 11 U.S.C. § 101(47)(A)(i).

11

## C. HomeBanc III

Upon remand and after a six-day trial, the Bankruptcy Court ruled that the auction was fair and customary, and therefore, Bear Stearns acted in good faith accepting the auction results as the fair market value of the thirty-seven securities. In reaching this holding, the Bankruptcy Court divided the question of good faith compliance with the GMRA into "three parts: (i) whether Bear Stearns'[s] decision to determine the Net Value of the Securities at Issue by auction in August 2007 was rational or in good faith; (ii) whether the auction process utilized by Bear Stearns was in accordance with industry standards; and (iii) whether Bear Stearns'[s] acceptance of the value obtained through the auction was rational or in good faith." J.A. 76.

The Court, in addressing the first sub-question, concluded that Bear Stearns acted in good faith by determining the securities' value via an auction, despite the turbulent condition of the residential mortgage-backed securities market in August 2007. HomeBanc argued that an auction cannot provide accurate price discovery when a market is dysfunctional, and while HomeBanc presented testimony that the residential mortgage-backed securities market was non-functional in August 2007, there was substantial opposing testimony that the market, though troubled, was functioning. "[T]here was [also] no evidence of other factors that might be considered indicia of market dysfunction: asymmetrical information between buyers and sellers, inadequate information in general . . . , market panic . . . , high transaction costs, the absence of any creditworthy market participants or fraud." J.A. 86. Moreover, "there was no indication . . . when

or if market prices would stabilize." J.A. 85-87. It was therefore reasonable for Bear Stearns to quickly liquidate the collateral via a sale. Because the Court found that the market was functioning in August 2007, it concluded that the auction was a commercially reasonable determinant of value.

Bear Stearns's auction process was also found to be reasonable: the procedures provided possible bidders with sufficient information to formulate a bid; the 4.5 days to place bids was more than what was typically given to sophisticated purchasers of residential mortgage-backed securities; Bear Stearns solicited many potential buyers, including its main competitors; and the rules prevented a Bear Stearns affiliate from gaining an unfair advantage in formulating its bid.

Lastly, the Court held that Bear Stearns acted in good faith when it accepted the outcome of the auction as the fair market value of the SAI. HomeBanc maintained that the auction results were egregious. Using its own discounted cash flow model, HomeBanc valued the nine SAI at $124.6 million. HomeBanc's Chief Investment Officer, however, estimated the value of the SAI at approximately $18.5 million on August 5, 2007—nine days before the auction closed—a value much closer to Bear Stearns's $8.1 million assessment on August 15, 2017. The Bankruptcy Court also highlighted that (1) HomeBanc tried and failed to find an alternative purchaser who would pay more for the thirty-seven securities, and (2) Bear Stearns paid a higher price for the thirty-seventh security than HomeBanc bargained for with J.P. Morgan.

**D. HomeBanc IV**

13

HomeBanc appealed again, initially contending that Bear Stearns did not act in good faith because the auction was held in a non-functioning market, failed to produce an actual sale, and resulted in an inexplicable valuation of the SAI. Finding that the Bankruptcy Court's good faith determination was one of historical fact and not clearly erroneous, the District Court upheld the judgment. The Court faulted HomeBanc for failing to demonstrate that the mortgage-backed securities market was dysfunctional in August 2007 or that the auction was carried out in bad faith.

HomeBanc alternatively asserted that the Bankruptcy Court erred by ignoring the safe harbor limits for credit enhancements under 11 U.S.C. § 101(47)(A)(v). Unlike the broad protections of § 559 that are available for § 101(47)(A)(i) repos, HomeBanc believed that credit enhancements under § 101(47)(A)(v) receive fewer protections under § 562. "The extent to which credit enhancements qualify as repurchase agreements entitled to bankruptcy safe harbor protection is 'not to exceed the damages in connection with any such agreement or transaction,'" which must be measured by "'commercially reasonable determinants of value.'" J.A. 116-17 (quoting 11 U.S.C. §§ 101(47)(A)(v), 562).

Based on the connection between §§ 101(47)(A)(v) and 562, HomeBanc claimed that the Bankruptcy Court failed to (1) recognize that Bear Stearns had violated the automatic bankruptcy stay and converted the securities, and (2) determine whether the auction was a "commercially reasonable determinant" of the securities' value. The District Court disagreed, holding that § 562 was inapplicable. Since Bear Stearns's liquidation of HomeBanc securities resulted in

14

excess proceeds and Bear Stearns never asserted a claim for damages, the District Court reasoned that the broad safe harbor protections of § 559, not § 562, were relevant. HomeBanc timely appealed to this Court.

## II

The Bankruptcy Court had jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the District Court exercised its jurisdiction under 28 U.S.C. § 158(a)(1). 28 U.S.C. § 158(d)(1) provides this Court with jurisdiction to review the District Court's final order.

This Court's "review of the [D]istrict [C]ourt's decision effectively amounts to review of the [B]ankruptcy [C]ourt's opinion in the first instance." *In re Segal*, 57 F.3d 342, 345 (3d Cir. 1995) (quoting *In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir. 1989) (internal quotation marks omitted)). We exercise plenary review of the Bankruptcy Court's interpretation of the Bankruptcy Code and clear-error review of its factual findings. *See In re J & S Properties, LLC*, 872 F.3d 138, 142 (3d Cir. 2017); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).

The parties dispute the standard of review that applies to the Bankruptcy Court's determination of good faith. HomeBanc asserts that a good faith determination constitutes a mixed question of law and fact that is subject to clear-error review for the underlying factual findings and plenary review for the Bankruptcy Court's "choice and interpretation of legal precepts and its application of those precepts to historical facts." *In re Trans World Airlines, Inc.*, 134 F.3d 188, 193 (3d

15

Cir. 1998). Bear Stearns responds that only clear-error review applies because HomeBanc "sets forth 'no choice and interpretation of legal precepts' of the Bankruptcy Court to which plenary review would be appropriate." Appellee Br. at 29 (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 152 (D. Del. 1999)).

As a general matter, this Court has long considered the determination of good faith to be an "ultimate fact." *Hickey v. Ritz-Carlton Rest. & Hotel Co. of Atlantic City*, 96 F.2d 748, 750-51 (3d Cir. 1938). An ultimate fact is commonly expressed in a standard enunciated by statute or by a caselaw rule, like negligence or reasonableness, and "[t]he ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact." *Universal Minerals v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir. 1981). Consequently, factual findings are reviewed for clear-error while "the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts" receive plenary review. *Id.* at 103.

Despite these general precepts, determining the applicable standard of review here is not so straightforward. We have previously held that whether a party filed a Chapter 11 bankruptcy petition in good faith is an ultimate fact subject to review as a mixed question of law and fact. *In re 15375 Memorial Corp. v. Bepco*, 589 F.3d 605, 616 (3d Cir. 2009). Similarly, we have concluded that whether a debtor is insolvent is an ultimate fact requiring mixed review. *See Trans World Airlines*, 134 F.3d at 193. Some District Courts, however, have held that good faith determinations under § 363(m) of the Bankruptcy Code receive clear-error review. *See In re*

16

*Polaroid Corp.*, No. 03-1168-JJF, 2004 WL 2223301, at *2 (D. Del. Sept. 30, 2004); *In re Prosser*, Bankr. L. Rep. 82, 437 (D.V.I. Mar. 8, 2013).

A determination of good faith necessarily flows from consideration of an array of underlying basic facts, making it an ultimate fact. *See Universal Minerals*, 669 F.2d at 102; *Hickey*, 96 F.2d at 750-51. Yet, the distinction between basic and ultimate facts can be murky; sometimes, there are intermediate steps on the path to an ultimate fact. *See In re 15375 Memorial Corp.*, 589 F.3d at 616 (referring to basic, inferred, and ultimate facts). This opacity gives us some pause, but no intermediate steps are currently before us for review. We therefore hold that a bankruptcy court's determination of good faith regarding a mandatory post-default valuation of collateral subject to a repurchase agreement is an ultimate fact subject to mixed review.[11] A bankruptcy court's basic factual findings are examined for clear-error while the ultimate fact of good faith receives plenary review.

## III

On appeal, HomeBanc challenges the District Court's decision that § 559, not § 562, was controlling and that Bear Stearns did not violate the automatic bankruptcy stay. Section 559 gives parties to a repurchase agreement a safe harbor from the automatic bankruptcy stay, which normally prevents creditors from collecting, recovering, or offsetting debts

---

[11] We do not (and need not) decide whether good faith is always an ultimate fact requiring mixed review.

without court approval.[12]  Thus, § 559 generally permits a non-defaulting party to liquidate collateral, according to the terms of the relevant repurchase agreement, without seeking court approval.  Section 562 also provides a safe harbor, though it is more limited.  For instance, § 562 requires that "damages" be measured at a certain time and using a "commercially reasonable determinant of value."  11 U.S.C. § 562.

As to whether § 559 or § 562 applies here, the text of § 101(47)(A)(v) is dispositive.  Subparagraph (v) specifies that repos include credit enhancements, but such credit enhancements are "**not to exceed the damages** in connection with any such agreement or transaction, **measured in accordance with section 562 of this title**."  11 U.S.C. § 101(47)(a)(v) (emphasis added).  While the protections of § 559 are generally available, the safe harbor does not encompass a recovery beyond the "damages" claimed.  We therefore must define "damages," as found in 11 U.S.C. § 101(47)(A)(v), to determine if § 562 applies to the nine SAI—each of which is a credit enhancement.

---

[12] Section 559 states in part: "The **exercise of a contractual right** of a **repo participant** or financial participant **to cause the liquidation** . . . of a repurchase agreement . . . **shall not be stayed**, avoided, or otherwise limited by . . . order of a court or administrative agency . . . [and] **any excess of the market prices received on liquidation** of such assets . . . over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements **shall be deemed property of the estate** . . . ."  11 U.S.C. § 559 (emphasis added).

18

HomeBanc asks this Court to interpret "damages" as meaning a "shortfall," "loss," "deficiency," or "debt." This would mean that when a repo participant liquidates a credit enhancement after default, any amount obtained in excess of the actual deficiency suffered, as measured according to § 562, is subject to the automatic bankruptcy stay, even if the surplus took years to develop. Conversely, Bear Stearns argues that if there is no claim for damages, then § 562 is inapplicable: The definition of "damages" must include a legal claim.

"Damages" is not defined within Title 11, but we hold for several reasons that the term refers to a legal claim for damages rather than a "loss," "shortfall," "deficiency," or "debt." First, "damages" is a term of art. Although probably not obvious to the layperson, every first-year law student learns to automatically connect "damages" with what is potentially recoverable in court, and not necessarily an underlying loss or injury.[13] Damages are "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." *Damages*, BLACK'S LAW DICTIONARY (11th ed. 2019); 1 DAN B. DOBBS, DOBBS LAW OF REMEDIES: DAMAGES-EQUITY-RESTITUTION § 3.1 (2d ed. 1993) ("The damages remedy is a judicial award in money, payable as compensation to one who has suffered a legally recognized injury or harm."). This is a plain term, and as a result, defining "damages" as a "debt" or

---

[13] At oral argument, counsel for HomeBanc inadvertently showed how "damages" are inextricably tied to a legal claim. He stated, "I think the damages are the - the recovery to which you may be entitled, if you prove some liability." Transcript of Oral Argument at 14, *In re HomeBanc Mortgage Corp.* (3d Cir. Sept. 26, 2019) (No. 19-2887).

"loss" without any associated legal claim would contradict common understanding within the legal profession.

Second, "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Am. Home Mortg.*, 637 F.3d at 255 (internal quotation marks and citations omitted). If Congress had wanted to define "damages" in a manner different from its commonly understood meaning, such as a "loss," "deficiency," or "debt," it could have done so. These terms appear elsewhere in Title 11, yet Congress chose not to employ them here. *See, e.g.*, 11 U.S.C. §§ 703(b), 726(a)(4), 727(a)(12)(B).

Third, other parts of Title 11 support a plain legal interpretation of "damages." "Damages" is used throughout Title 11 to refer to a legal claim. *See, e.g.*, 11 U.S.C. §§ 110(h)(5)(i)(1)(A)-(i)(2), 362 (k)(1)-(2), 523 (a)(19)(B)(iii). Moreover, the text of § 502(g)(2) and the section title of § 562 suggest that "damages" means a legal claim for loss.[14]

Fourth, defining "damages" as a "loss," "shortfall," or "debt" would create a problematic process for creditors seeking to quickly liquidate collateral after a default. Under HomeBanc's proposed approach, a non-defaulting party would

---

[14] *See* 11 U.S.C. § 502(g)(2) ("A claim for damages calculated in accordance with section 562 . . . ."); 11 U.S.C. § 562 ("Timing of damage measurement in connection with swap agreements, securities contracts, forward contracts, commodity contracts, repurchase agreements, and master netting agreements").

first determine which collateral constitutes a repurchase agreement under § 101(47)(A)(i) versus a credit enhancement under § 101(47)(A)(v): repurchase agreements would receive the full protection of § 559 while credit enhancements would be subject to the conditions of §§ 101(47)(A)(v) and 562. Once the collateral was categorized, a creditor could liquidate only the § 101(47)(A)(i) repos. Afterwards, the non-defaulting party would determine if there was any remaining shortfall. If so, then the § 101(47)(A)(v) credit enhancements could be sold, one at a time, to fill the hole.

We consider HomeBanc's approach impractical. Whether a transaction is a repurchase agreement under § 101(47)(A)(i) or a credit enhancement under § 101(47)(A)(v) is not always clear cut—the parties in this case litigated this issue for almost a decade. Creditors often seek to liquidate quickly, but a need to differentiate between repos and credit enhancements would substantially slow this process. It is also likely that repo participants would litigate this issue because of the potential application of §§ 101(47)(A)(v) and 562. Moreover, the need to differentiate between repurchase agreements and credit enhancements could eliminate the ability to buy or sell collateral via "all or nothing" bids. Bear Stearns, in this case, would have had to conduct multiple separate auctions: an initial auction to value the twenty-eight traditional repos and subsequent auctions to individually value the nine credit enhancements to cover any shortfall. Bear Stearns could not have made an "all or nothing" bid for the remaining securities. Such an approach is unduly cumbersome. The literal application of the statute, in contrast, does not produce "an absurd result." *See Douglass v. Convergent Outsourcing*, 765 F.3d 299, 302 (3d Cir. 2014).

21

HomeBanc does raise one concern about our approach which we consider valid: interpreting "damages" to require a deficiency claim may incentivize bad behavior. A non-defaulting party may seek to price the collateral at a level equal to the debt owed by the defaulting party, keeping any upside for itself and avoiding judicial scrutiny simply by not asserting a deficiency claim. The nature of repos, however, provides parties with the opportunity to address this issue contractually. For example, the GMRA requires a good faith valuation, and other agreements could do likewise. Furthermore, if a creditor's loss is sufficiently large, it will seek damages, even if doing so invites judicial scrutiny. Because of the aforementioned reasons, we hold that "damages" as described in § 101(47)(A)(v) necessitates the filing of a deficiency claim.

## IV

Though § 562 is inapplicable because Bear Stearns did not initiate a damages action, it appears that the auction did not yield excess proceeds. As this Court has explained, excess proceeds result when "the market prices exceed the stated repurchase prices." *Am. Home Mortg.*, 637 F.3d at 255-56. At the time of HomeBanc's default, the contractual repurchase price for the thirty-seven securities was approximately $64 million, but the auction netted only $61.756 million. That is a shortfall, not an excess.

Notwithstanding the lack of excess proceeds, we conclude that the Bankruptcy Court appropriately applied § 559. Most importantly, the text of § 559 does not require excess proceeds:

22

> The **exercise of a contractual right** of a **repo participant** or financial participant **to cause the liquidation** . . . a repurchase agreement . . . **shall not be stayed**, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency . . . . In the event that a repo participant or financial participant liquidates one or more repurchase agreements . . . and under the terms of one or more such agreements has agreed to deliver assets subject to repurchase agreements to the debtor, **any excess of the market prices received on liquidation** of such assets . . . over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements **shall be deemed property of the estate** . . . .

11 U.S.C. § 559 (emphasis added).  Section 559 states that "any excess . . . shall be deemed property of the estate."  It does not say "the excess."  "Any" is commonly used to refer to indefinite or unknown quantities.[15]  For instance, is there any money left in the bank account?  In § 559, the indefinite or unknown quantity is the excess.  There may be an excess, but the text does not demand that one exists.  Rather, it establishes a condition—transferring the property to the estate—*if* there

---

[15] *See Any*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/any#learn-more; *Any*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/ view/Entry/8973?redirectedFrom=any#eid.

are excess proceeds.  The text reveals that § 559 can apply when there is an excess, shortfall, or break-even amount.

We recognize that in *American Home Mortgage* we stated that "[s]ections 559 and 562 address different situations. Section 559 applies **only** in the event that a . . . liquidation results in excess proceeds. . . . § 562 . . . applies when the contract is liquidated, terminated, or accelerated, and results in *damages* rather than excess proceeds."  637 F.3d at 255-56 (emphasis added).  Taken out of context, this dictum could be wrongly interpreted to suggest that § 559's authorization of a repo participant to liquidate collateral applies "only" if the liquidation results in excess proceeds.  This Court used the word "only" to contrast the ordinary division between § 559 with § 562, not to create a binding either/or proposition. *Am. Home Mortg.*, 637 F.3d at 255-56.  Judge Rendell's concurrence implicitly supports this narrow comparative interpretation, stating that a liquidation of a repurchase agreement is exempt from automatic stay provisions, making no mention of whether an excess is necessary for the protections of § 559. *Id.* at 258 (Rendell, J., concurring).  Our reading avoids any conflict with the plain text of § 559. Furthermore, the case before us involves a "loss" or "shortfall" without a claim for "damages," presenting unique circumstances not addressed in *American Home Mortgage*.

The few cases and treatises that explore this issue show that a repo participant can liquidate a repurchase agreement regardless of whether the sale results in an excess, shortfall, or a break-even amount. *See Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 67 B.R. 557, 596 (D.N.J. 1986) ("Any proceeds from the sale of the securities in excess of the

24

agreed repurchase price are deemed property of the estate."); *In re TMST, Inc.*, No. 09-17787-DK, 2014 WL 6390312, at \*4 (Bankr. D. Md. Nov. 14, 2014) ("Concomitant to those rights granted to the repurchase creditor to liquidate with finality the pledged securities, in Sections 559 and 562 Congress vouchsafed to the bankruptcy estate the right to any excess market value of such securities."); 5 COLLIER ON BANKRUPTCY § 559.04 (16th ed. 2019) ("Section 559 specifies, however, that any excess proceeds or value remaining after the nondefaulting party has recovered the amounts owed to it by the debtor must be paid to the debtor . . . ."); 1 JOAN N. FEENEY ET AL., BANKRUPTCY LAW MANUAL § 7:19 (5th ed. 2019) (a repo "participant is free to offset or net out any termination value . . . ."); 4 WILLIAM L. NORTON, JR. AND WILLIAM L. NORTON, III, NORTON BANKRUPTCY LAW AND PRACTICE § 75:4 (3d ed. 2019) ("Code § 559 also contains a provision dealing with excess proceeds in the event that a repo participant liquidates . . . and the repo participant has agreed to deliver any surplus assets to the debtor. In this event, any excess . . . shall be deemed property of the estate . . . ."). Although the auction yielded no excess proceeds, the protections of § 559 were appropriately applied.

## V

Section 559 generally provides an exemption from the automatic bankruptcy stay to the extent that a liquidation accords with the relevant repurchase agreement. Thus, Bear Stearns's safe harbor is contingent on its adherence to the GMRA—upon default, to honestly and rationally value the remaining securities for purposes of crediting HomeBanc's debt. The Bankruptcy Court held that Bear Stearns valued the

SAI in good faith compliance with the GMRA, but HomeBanc claims otherwise.[16] We exercise plenary review over this determination of good faith and agree with the Bankruptcy Court that Bear Stearns complied with the GMRA.

First, HomeBanc contends that the auction did not provide the fair market value of the SAI because a sale never occurred. Bear Stearns simply shifted the SAI from the finance desk to the mortgage trading desk and made an internal accounting adjustment. The GMRA required that Bear Stearns reach a "reasonable opinion" regarding the securities' "fair market value, having regard to such pricing sources and methods . . . as . . . [it] consider[ed] appropriate." J.A. 1038. There was no clause that required Bear Stearns to sell the securities to an outside party. Moreover, whether an exchange of funds occurred is immaterial to establishing the securities' fair market value.[17]

HomeBanc also asserts that Bear Stearns acted in bad faith because it knew or should have known that, given the dysfunctional market for mortgage-backed securities in August 2007, an auction would not identify the fair market value of the

---

[16] On appeal, neither party contests the Bankruptcy Court's conclusion that the GMRA includes a "good faith" standard: Bear Stearns was required to act in "good faith" when determining the fair market value of the securities at issue. The parties dispute whether Bear Stearns's actions met that standard.

[17] A discount cash flow model, for example, is another way to determine fair market value without an actual "sale."

SAI.[18]   HomeBanc highlights, among other things, that (1) several witnesses testified that the mortgage-backed securities market was in "turmoil" and "dysfunctional" in August 2007,[19] (2) Bear Stearns's American Home Mortgage auction, a week prior, failed to produce an outside bidder, and (3) Bear Stearns reduced its internal valuation of the thirty-seven securities from roughly $119 million on Friday, August 3, 2007 to approximately $68 million on Monday, August 6, 2007.

Despite this evidence, the Bankruptcy Court was correct in determining that there was good faith where the market for

---

[18] The parties have invoked the term "market dysfunction." Neither the briefs nor oral argument provided substantial insight into this term and its meaning. Although there seems to be no accepted definition, dysfunction likely includes low liquidity and enough instability in a market such that the routine price discovery process is not functioning properly.

Whether the securities market in August 2007 was dysfunctional is a significant question because it bears on whether Bear Stearns rationally valued the securities using an auction. In *American Home Mortgage*, this Court endorsed the view that "the market price should be used to determine an asset's value when the market is functioning properly. It is only when the market is dysfunctional and the market price does not reflect an asset's worth should one turn to other determinants of value." 637 F.3d at 257.

[19] A Bear Stearns securities trader testified that the market was "dysfunctional" with "little to no liquidity," and a former Bear Stearns senior managing director testified that "we knew it was a bad market" and that the market was "illiquid." J.A. 870, 899, 1007-09.

mortgage-backed securities was sufficiently functional to conduct an auction that complied with the GMRA. A Bear Stearns employee, an economic consultant, and an outside executive familiar with the repurchase market all testified that the market was turbulent but not dysfunctional. The record also contains substantial additional testimony to support this characterization: other traders of mortgage-backed securities stated that transactions were occurring in the summer of 2007. There is also little evidence indicative of market dysfunction, such as potential buyers lacking sufficient information to price securities and the absence of any creditworthy market participants. Here, HomeBanc mistakenly equates a declining market with a dysfunctional one. The residual mortgage-backed securities market was functioning adequately for Bear Stearns, in good faith, to value the SAI via an auction.

Alternatively, HomeBanc argues that the auction procedures were flawed, rendering the sale price inaccurate. One academic witness testified that the information supplied to potential bidders was inadequate, the time given to submit a bid unreasonably short, and the bidding rules intentionally designed to frighten away outside interest. This contrasted with the testimony of several securities traders who opined that the information provided in Bear Stearns's bid solicitation was sufficient to value the securities, the auction provided adequate time to formulate a bid, and the bidding rules were attractive rather than off-putting. Bear Stearns's solicitation reached many potential buyers, including several of its competitors. Additionally, the auction rules were designed to prevent Bear Stearns's mortgage trading desk from obtaining any objectionable advantage—(1) Bear Stearns affiliates had to submit their bids thirty minutes before the deadline for outside

28

bids, and (2) Bear Stearns's legal department, which was located in a separate building from the mortgage trading desk, collected all the bids. We will not disturb the Bankruptcy Court's finding that the auction process followed proper industry practices.

HomeBanc also maintains that Bear Stearns did not value the SAI in good faith compliance with the GMRA because the post-auction value assigned to each of the nine SAI, $900,000 a piece, was arbitrary—Bear Stearns never justified why it valued each security at $900,000. The SAI were diverse, having different collateral and cash flow rules, and Bear Stearns valued each differently weeks before the auction. Thus, HomeBanc insinuates that the allocated amount had no relationship to what the securities were actually worth. "[T]he $900,00 'price' is simply what remained of Bear Stearns's total bid after subtracting the unchallenged valuations attributed to the 27 securities not at issue, neatly divided across the securities at issue." J.A. at 38-39.

The GMRA required a rational, good faith determination of the fair market value of the securities, and this requirement could be met by a reasonable all-or-nothing bid for the securities. A buyer may allocate the winning bid in a variety of ways, but the defaulting party's debt is always credited the same amount: no matter how Bear Stearns divided its bid of $60.5 million, HomeBanc's debt only decreased by that lump sum amount. We see no need to address this argument further since the post-auction allocation to individual securities says little about whether the all-or-nothing bid constituted a fair market valuation.

29

In spite of HomeBanc's attempts to show otherwise, Bear Stearns acted in good faith compliance with the GMRA: the market conditions were adequate to ascertain fair market value via an auction, and the auction procedures were adequate.  Consequently, Bear Stearns rationally accepted the auction results as providing the fair market value of the remaining thirty-seven securities.  Bear Stearns was obligated to follow the GMRA, and it did so.

## VI

In conclusion, we hold that (1) a Bankruptcy Court's determination of good faith regarding an obligatory post-default valuation of collateral subject to a repurchase agreement receives mixed review.  Factual findings are reviewed for clear-error while the ultimate issue of good faith receives plenary review; (2) 11 U.S.C. § 101(47)(A)(v) "damages," which may trigger the requirements of § 562, require a non-breaching party to bring a legal claim for damages; (3) the safe harbor protections of 11 U.S.C. § 559 can apply to a non-breaching party that has no excess proceeds; and (4) Bear Stearns liquidated the securities at issue in good faith compliance with the GMRA.  Thus, we will affirm the judgment.